# In re N-M-A-, Applicant

*Decided October 21, 1998*

U.S. Department of Justice
Executive Office for Immigration Review
Board of Immigration Appeals

(1) Under 8 C.F.R. § 208.13(b)(1)(i) (1998), where an asylum applicant has shown that he has been persecuted in the past on account of a statutorily-protected ground, and the record reflects that country conditions have changed to such an extent that the asylum applicant no longer has a well-founded fear of persecution from his original persecutors, the applicant bears the burden of demonstrating that he has a well-founded fear of persecution from any new source.

(2) An asylum applicant who no longer has a well-founded fear of persecution due to changed country conditions may still be eligible for a discretionary grant of asylum under 8 C.F.R. § 208.13(b)(1)(ii) only if he establishes, as a threshold matter, compelling reasons for being unwilling to return to his country of nationality or last habitual residence arising out of the severity of the past persecution.

(3) The applicant failed to establish compelling reasons arising out of the severity of the past persecution for being unwilling to return to Afghanistan where he suffered beatings during a month-long detention and the disappearance and likely death of his father.

Robert B. Jobe, Esquire, San Francisco, California, for the applicant

James S. Stolley, Jr., Assistant District Counsel, for the Immigration and Naturalization Service

Before: Board En Banc: VACCA, HEILMAN, HOLMES, HURWITZ, VILLAGELIU, FILPPU, COLE, MATHON, JONES, GRANT, and SCIALABBA, Board Members. Concurring and Dissenting Opinions: ROSENBERG, Board Member; GUENDELSBERGER, Board Member, joined by SCHMIDT, Chairman.

FILPPU, Board Member:

The applicant, a native and citizen of Afghanistan, has appealed from the Immigration Judge's decision of July 10, 1995, denying him asylum and withholding of exclusion and deportation under sections 208 and 243(h) of

---

1 Since amendments made by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Division C of Pub. L. No. 104-208, 110 Stat. 3009-546 (enacted Sept. 30, 1996) ("IIRIRA"), are not applicable here, the statutory citations in the text above refer to the Act as it existed prior to the signing of the IIRIRA.

the Immigration and Nationality Act, 8 U.S.C. §§ 1158 and 1253(h) (1994).[1] The applicant has also filed a motion to remand the record for further proceedings based on changes in country conditions in Afghanistan that have arisen since the time of his hearing. The Immigration and Naturalization Service has filed an opposition to the applicant's motion to remand. The appeal will be dismissed, and the motion to remand will be granted.

## I. ISSUES AND FINDINGS

As per our regulatory authority, our review is de novo with regard to issues on appeal, unless otherwise noted, e.g., as with credibility determinations by Immigration Judges, which are given deference. *See generally Matter of Burbano*, 20 I&N Dec. 872 (BIA 1994). The principal issue before us on appeal is the scope of the regulatory presumption of 8 C.F.R. § 208.13(b)(1)(i) (1998). The dispositive issue in the motion to remand is the effect of the new conditions in Afghanistan in relation to the applicant's fear of religious persecution. We address each issue in turn.

But before we turn to the questions raised by this case, it is appropriate to add a cautionary note. On June 11, 1998, a proposed rule was published in the Federal Register. If adopted as proposed, that rule would make meaningful changes in the regulatory language we address today. *See* 63 Fed. Reg. 31,945-50 (1998). Importantly, our reading of the existing regulations should not be seen as an indication of how we might construe the language of the proposed rule.

We return to the case at hand. The current regulatory presumption of 8 C.F.R. § 208.13(b)(1)(i) provides that an applicant who has established that he has suffered past persecution on account of a statutorily-protected ground will be presumed to have a well-founded fear of future persecution unless a preponderance of the evidence establishes that conditions in the applicant's country of nationality or last habitual residence have changed to such an extent that the applicant no longer has a well-founded fear of future harm if he were to return. We hold that 8 C.F.R. § 208.13(b)(1)(i) (1998) sets forth an evidentiary presumption and that the presumption is extinguished by changed conditions in the applicant's country revealing that the particular threat, which led to the past harm, no longer exists. Accordingly, once an applicant has demonstrated that he has suffered past persecution on account of a statutorily-protected ground, and the record reflects that country conditions have changed to such an extent that the applicant no longer has a well-founded fear of persecution from his original persecutors, the applicant bears the burden of demonstrating that he has a well-founded fear of persecution from any new source.

We also find that the applicant did not sufficiently demonstrate at the hearing that he has a well-founded fear of harm from the Jamiat faction or any other Afghan mujahidin faction on account of a statutorily-protected ground. We further determine that the applicant did not meet his burden of proving compelling reasons arising out of the severity of his past persecution for his unwillingness to return to Afghanistan, such that he may be granted asylum on the strength of past persecution alone. 8 C.F.R. § 208.13(b)(1)(ii) (1998).

In his motion to remand, the applicant argues that the rise of the Taliban in Afghanistan gives him both new and continuing fears of harm on account of his political opinion and his religious beliefs. We first acknowledge that the applicant has met the regulatory requirements of providing evidence of changed circumstances arising in Afghanistan which is material and was not available at the prior hearing. 8 C.F.R. § 3.2(c)(3) (1998). The Service, however, argues that the applicant has failed to provide any evidence other than generalized country conditions. We disagree. In addition to considerable documentation regarding the Taliban's dominance of Afghanistan, the applicant has provided an affidavit detailing his religious views and his concerns about the Taliban's control in Afghanistan. While we conclude that the applicant has not established that he has a well-founded fear of persecution on account of his actual or imputed political opinion, we do find that he has a made an adequate showing that he has a well-founded fear of harm on account of his religious views such that a remand for further proceedings is appropriate.

## II. FACTS

At his hearing, the applicant testified to having suffered persecution in Afghanistan in 1989 during the mujahidin's struggle to overthrow the communist-supported government. In October 1988, the communist secret police (KHAD) came to the applicant's home in the middle of the night and kidnaped his father, who had been providing clothing and medical supplies to the Jamiat party, a mujahidin faction. The applicant related that he had not seen his father since that night and that he assumed his father was dead. Two weeks after his father's disappearance, the KHAD returned to the family's home in the middle of the night and searched the residence. The KHAD told the applicant that the search was routine, but the applicant discovered the next day that no other homes in the neighborhood had been searched. Shortly after his father's disappearance, the applicant agreed to distribute anti-communist flyers on behalf of the Jamiat party. In 1989, the KHAD again returned to his home to conduct another search. During this search, the KHAD found one of the flyers in the applicant's home.

The applicant testified that after the KHAD found the flyer they took him to a small house where he was questioned about the contraband flyer, his family, and his educational background. He was detained for approximately 1 month and was beaten periodically by the KHAD. The applicant described being hit and kicked during questioning, as well as deprived of food for 3 days. He lost consciousness and was hospitalized while under KHAD custody. He related that his entire body was covered with bruises and that he had a deep wound on his right leg. He escaped from the hospital with the assistance of his father's friend and fled to Pakistan, where he stayed for 6 weeks recovering from his injuries before coming to the United States. He testified that he is afraid to return to Afghanistan because of the ongoing fighting and because he is now culturally different from his fellow Afghans.

The Immigration Judge denied relief to the applicant because he found that the country conditions in Afghanistan had changed to the extent that the communists no longer posed a threat to the applicant. The Immigration Judge found that the applicant's fear of harm from the Jamiat party was unreasonable because the applicant had previously assisted them. Instead, the Immigration Judge found that the applicant's fear of returning to Afghanistan was based on the factional civil war plaguing Afghanistan. The record contains a 1995 Department of State profile of asylum claims and country conditions for Afghanistan, which discloses that the situation in Afghanistan changed dramatically in April 1992 when the communist regime of President Najibullah was toppled by a coalition of mujahidin forces. Bureau of Democracy, Human Rights, and Labor, U.S. Dep't of State, *Afghanistan-Profile of Asylum Claims & Country Conditions* (Jan. 1995) [hereinafter *Profile*]. The coalition forces took control of the capital and proclaimed an amnesty for all the former regime members except the deposed president. In October 1992, Burhanuddin Rabbani of the Jamiat faction was elected president for a 2-year term. The *Profile* discusses the lack of control that the central government has been able to wield over the factional fighting that then persisted among the armed militia groups. But the *Profile* makes it clear that the "civil war . . . between the resistance fighters and communist or pro-communist central governments . . . no longer exists." *Profile, supra*, at 4.

The new evidence submitted by the applicant in his motion to remand reveals that the Taliban now controls at least three-fourths of Afghanistan. The Taliban, or student militia, first appeared on the scene in Afghanistan in 1994. The nucleus of the Taliban military force consists of former mujahidin fighters and Afghan students from conservative Islamic schools. The Taliban has imposed its ultraconservative views of Islam on the Afghan population by requiring the males to attend prayer at the mosque, to grow beards, and to wear the traditional Islamic garb. Women have been prohibited from working, attending school, and going out in public without a male

relative. The Taliban has established Islamic courts and enforces its control through strict and brutal adherence to its religious edicts and criminal codes. Violations of these edicts and codes are punished summarily and severely. Typical punishments include stonings, beatings, and public executions.

## III. ARGUMENTS ON APPEAL

At the asylum hearing, the applicant conceded and the record reflected that the applicant's persecutors, the communists, were no longer in power in Afghanistan. On appeal, the applicant acknowledges that the Immigration and Naturalization Service met its burden of demonstrating that the government in Afghanistan has changed since the applicant left Afghanistan. The applicant argues, however, that the Service has only met the first part of its burden.[2] He asserts that the Service must also show that the applicant no longer has a well-founded fear of persecution upon return to Afghanistan. The applicant argues that the Service did not meet its burden of showing that he no longer has a well-founded fear of persecution from rival political groups. In particular, the applicant argues that because he suffered past persecution on account of a protected ground at the hands of the communists, the burden shifts to the Service to show that he no longer has a well-founded fear of future persecution from any of the mujahidin factions. Also, in his motion papers, he argues that the Service must make its showing as to the Taliban as well. We find, however, that once the presumption of a well-founded fear of harm has been rebutted, the applicant has the burden to demonstrate the reasonableness of his fear from any potential new source of harm.

The applicant argues in the alternative that he has established that he has a well-founded fear of persecution from the various mujahidin factions because of an actual and imputed political opinion. He also argues that the regulation controlling discretionary grants of asylum is invalid because it conflicts with the Act, case law from the United States Court of Appeals for the Ninth Circuit, and congressional intent. Finally, the applicant argues that, even under a strict interpretation of the applicable regulation, he qualifies for a discretionary grant of asylum. We find these arguments unpersuasive.

---

[2]The regulations do not explicitly place the burden on the Service to show that country conditions have changed. In *Matter of H-,* 21 I&N Dec. 337, at 346-47 (BIA 1996), we stated that as "a practical matter, it will be the Service's burden to rebut the presumption, whether by adducing additional evidence or resting upon evidence already in the record."

## IV. REGULATION GOVERNING THE
## APPLICANT'S ASYLUM CLAIM

An applicant is eligible for asylum under section 208 of the Act if he can establish that he suffered past persecution or that he has a well-founded fear of future persecution on account of a protected ground. *Prasad v. INS*, 47 F.3d 336, 338 (9th Cir. 1995). According to the regulation at issue, 8 C.F.R. § 208.13(b) (1998),

The applicant may qualify as a refugee either because he or she has suffered actual past persecution or because he or she has a well-founded fear of future persecution.

(1) *Past Persecution*. An applicant shall be found to be a refugee on the basis of past persecution if he or she can establish that he or she has suffered persecution in the past in his or her country of nationality or last habitual residence on account of race, religion, nationality, membership in a particular social group, or political opinion, and that he or she is unable or unwilling to return to or avail himself or herself of the protection of that country owing to such persecution.

(i) If it is determined that the applicant has established past persecution, he or she shall be presumed also to have a well-founded fear of persecution unless a preponderance of the evidence establishes that since the time the persecution occurred conditions in the applicant's country of nationality or last habitual residence have changed to such an extent that the applicant no longer has a well-founded fear of being persecuted if he or she were to return.

(ii) An application for asylum shall be denied if the applicant establishes past persecution under this paragraph but it is also determined that he or she does not have a well-founded fear of future persecution under paragraph (b)(2) of this section, unless it is determined that the applicant has demonstrated compelling reasons for being unwilling to return to his or her country of nationality or last habitual residence arising out of the severity of the past persecution. If the applicant demonstrates such compelling reasons, he or she may be granted asylum unless such a grant is barred by paragraph (c) of this section.

### A. Analysis of the Regulatory Language

Our analysis of the language of 8 C.F.R. § 208.13(b)(1)(i) leads us to the conclusion that the regulation serves as an evidentiary presumption founded on the probability of a past event being indicative of a future event. *See McCormick on Evidence* § 343, at 454 (John William Strong, ed., 4th ed. 1992). As such, it provides an evidentiary link between the actual past persecution that an applicant has suffered and any well-founded fear of

future persecution. The presumption is based on the possibility that a persecutor, once having shown an interest in harming the applicant, might seek to harm the applicant again should the applicant be forced to return within the persecutor's reach. Because it is foreseeable that a persecutor would continue to be interested in one of his victims of persecution, the regulation removes the burden from the applicant to show that he may suffer persecution again at the hands of his past persecutor. Thus, once the applicant has shown that he has suffered past persecution on account of a protected ground, the record must reflect that the applicant no longer has a well-founded fear of persecution from his past persecutor. Accordingly, if the record reflects that country conditions relating to the past persecution have changed to such an extent that the applicant no longer has a well-founded fear of harm from his original source of persecution, the evidentiary presumption is extinguished, and the burden returns to the applicant to establish his well-founded fear of persecution from any new source.[3]

The evidentiary presumption rationale of 8 C.F.R. § 208.13(b)(1)(i) makes sense in the larger context of asylum law. Asylum is a prophylactic protection for those who might face future persecution.[4]  *See Marquez v. INS*, 105 F.3d 374 (7th Cir. 1997). In *Marquez*, the court noted that asylum is designed not to remedy the past, but to protect those who might suffer future persecution. The rationale for looking at past persecution is that the "past serves as an evidentiary proxy for the future."  *Id.* at 379; *see also* Guy S. Goodwin-Gill, *The Refugee in International Law* 23 (1983) (stating that the "applicant for refugee status, however, is adducing a future speculative risk as the basis for a claim to protection"). While a finding that an asylum applicant has suffered past persecution may be sufficient to meet the statutory refugee definition, the determination that an applicant may not be subjected to future persecution may well result in the denial of relief. *INS v. Cardoza-Fonseca*, 480 U.S. 421, 428 n.5 (1987).

The evidentiary link between past persecution and the well-founded fear of future persecution is also contemplated in the 1951 United Nations Convention Relating to the Status of Refugees, *adopted* July 28, 1951, 189

---

[3]The regulations currently limit the rebutting of the presumption of a well-founded fear of persecution to the situation where country conditions have changed. 8 C.F.R. § 208.13(b)(1)(i).

[4]The language of the Immigration and Nationality Act also contemplates the loss of refugee status once country conditions have changed. Under section 208(b) of the Act, asylum may be terminated when the Attorney General determines that country conditions have changed to such an extent that the asylum applicant no longer meets the definition of a refugee under section 101(a)(42) of the Act, 8 U.S.C. § 1101(a)(42) (1994).

[5]The United States is not a signatory to the 1951 Convention, but in 1968, the United States acceded to the United Nations Protocol Relating to the Status of Refugees,  Jan. 31, 1967, 19 U.S.T. 6223, T.I.A.S. No. 6577 ("Protocol"). Except for the temporal limitations of

U.N.T.S. 150 (entered into force Apr. 22, 1954) ("Convention").[5] Article 1C of the Convention provides for the various situations in which an individual will cease to be considered a refugee. In particular, Article 1C(5) states that an individual cannot "refuse to avail himself of the protection of the country of his nationality" if "the *circumstances in connexion with which he has been recognized as a refugee have ceased to exist.*" (Emphasis added.) Thus, the Convention provides the link between the circumstances of the past persecution and the applicant's refugee status given changed country conditions. *See also* Atle Grahl-Madsen, 1 *The Status of Refugees in International Law* 176 (1966) ("[I]f a person has experienced persecution, that may be considered *prima facie* proof to the effect that he may again become a victim of persecution should he return to his home country, *so long as the regime which persecuted him prevails in that country.*" (second emphasis added)).

The requisite link between the past persecution and the past persecutor is also found in *Matter of Chen*, 20 I&N Dec. 16 (BIA 1989), where we held that when an applicant has established past persecution on account of a protected ground, the Service ordinarily will have to present, as a factor militating against the favorable exercise of discretion, evidence that there is little likelihood of present persecution . . . *such as where the government from which the threat of persecution arises has been removed from power*. Thus a rebuttable presumption arises that an alien who has been persecuted in the past by his country's government has reason to fear *similar persecution* in the future.

*Id.* at 18 (emphasis added) (footnote omitted).

In *Matter of Chen*, we found that the asylum applicant had established that the harm he suffered in China during the Cultural Revolution on account of his religion rose to the level of past persecution. We further found that country conditions in China had changed to such an extent that the applicant no longer had a well-founded fear of persecution on account of his religion. The burden then returned to the applicant to show that he had a well-founded fear of future persecution. We found that the applicant had not met *his burden* of establishing a well-founded fear of persecution. *Id.* at 21.

### B. Applicant's Interpretation of the Regulatory Language

---

the Convention, which are not relevant for our purposes, Article I of the Protocol directly incorporates the definition of a refugee (and the provisions pertaining to the cessation of refugee status) by reference to Article 1 of the Convention.

The applicant argues for the use of an alternative interpretation of the 8 C.F.R. § 208.13(b)(1)(i) presumption that we would describe as more of a "compassionate" than an evidentiary presumption. The applicant contends that, as a compassionate presumption, the regulations should be read to provide that an applicant who has suffered past persecution should have a lesser burden in establishing his asylum claim precisely because he has suffered past persecution. According to the applicant, once he has shown past persecution, the burden shifts to the Service to demonstrate that he no longer has a well-founded fear from any source, including any potential persecutors who have surfaced as possible threats since the time of his departure from his country.

We believe that the applicant's interpretation of the regulatory presumption under 8 C.F.R. § 208.13(b)(1)(i) could lead to incongruous results. The applicant's interpretation could place the burden on the Service to negate the possibility of persecution where past persecution was suffered decades ago or arose from circumstances substantially different from those presently claimed. For example, under the applicant's interpretation, a victim of past political persecution, inflicted by a regime that was overthrown 20 years ago, could allege fears of religious persecution arising from a conversion of faith occurring very recently during a visit to the United States. Even if the applicant continued to live safely in the country of persecution for the 20 years after the persecutory act, the burden would be on the Service to prove that this claimant does not now have a well-founded fear arising out of this entirely new and unrelated ground. This would be a burden not shown to have been contemplated by the 1951 Convention, the Immigration and Nationality Act, or our case law. We therefore reject the applicant's interpretation of the regulatory language.[6]

Our holding today does not stand for the proposition that any change in a regime automatically reverts the burden of proof back to the applicant to show that he has a well-founded fear of persecution from the changed regime or its successor. Nor does it substitute for careful analysis of the facts of each applicant's individual circumstances. *See Vallecillo-Castillo v. INS*, 121 F.3d 1237 (9th Cir. 1997); *Osorio v. INS*,

---

[6]The concurring and dissenting opinion of Board Member Guendelsberger, among other things, compares the language of 8 C.F.R. § 208.13(b)(1)(i) to the Government's burden of proof in other areas, such as denaturalization, expatriation, and rescission of adjustment proceedings. In these other areas, however, the burden is on the Government to revoke rights or benefits previously granted. As noted in *Schneiderman v. United States*, 320 U.S. 118, 125 (1943), "[R]ights once conferred should not be lightly revoked." Under the regulation at issue here, no status has yet been conferred on the asylum applicant, and the comparison advanced by the dissent is simply unfounded. *See also* 8 C.F.R. § 208.22(e) (1998) (requiring the Service to show, by a preponderance of evidence, that the regulatory requirements have been met to revoke a grant of asylum in proceedings before an Immigration Judge or this Board).

99 F.3d 928, 932-33 (9th Cir. 1996); *see also* Office of the United Nations High Commissioner for Refugees, *Handbook on Procedures and Criteria for Determining Refugee Status Under the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees* para. 135, at 31 (Geneva, 1992) [hereinafter *Handbook*] ("'Circumstances' refer to fundamental changes in the country, which can be assumed to remove the basis of the fear of persecution.") For example, a despot may be ousted from the seat of government, yet still wield considerable influence and pose a threat to the applicant, or the new leadership may harbor the same animosities as the old. This type of change of government would not rebut the presumption that an asylum applicant no longer has a well-founded fear. Instead, the record would have to reflect that circumstances had changed *to such an extent* that the applicant no longer has a well-founded fear of persecution arising from the conditions that led to the past harm. 8 C.F.R. § 208.13(b)(1)(i).

## V. APPLICATION OF THE REGULATORY PRESUMPTION

Applying our interpretation of the regulations to the facts of this case, we first find that the harm that the applicant suffered rose to the level of past persecution. Accordingly, under 8 C.F.R. § 208.13(b)(1)(i), the record must reflect that conditions in Afghanistan have changed to such an extent that the applicant no longer has a well-founded fear of persecution from the communists. We find that the record does reflect such a change.

The 1995 Department of State *Profile* contained in the record discusses the dramatic changes that have occurred in Afghanistan since the 1992 overthrow of the communist-supported government of President Najibullah. The *Profile* characterizes the ongoing civil war mainly as a "struggle among wholly opportunistic militia commanders for power in a post-war Afghanistan." *Profile, supra*, at 3. The *Profile* clearly states that the "primary condition which gave rise to the flight of some 5 million Afghans from their homeland—a civil war since 1978 between the resistance fighters and communist or pro-communist central governments of varying Marxist-Leninist hues—no longer exists." *Id.* at 4. The *Profile* also states that some parts of Afghanistan, particularly those in the west, are "non-conflictive." *Id.* at 6. Relying on the Department of State *Profile* and the applicant's concessions, we find that the country conditions have changed to such an extent in Afghanistan that the applicant no longer has a well-founded fear of harm from the members of the former communist government within the contemplation of *INS v. Cardoza-Fonseca, supra*, and *Matter of Mogharrabi*, 19 I&N Dec. 439 (BIA 1987). Consequently, the applicant bears the burden of proof respecting new sources of possible persecution.

## VI. APPLICANT'S OTHER ARGUMENTS ON APPEAL

### A. Well-founded Fear of Persecution from the Mujahidin

On appeal, the applicant argues that, even if the burden reverts to him to show that he has a well-founded fear of persecution from the mujahidin factions, he has met that burden. At his hearing, the applicant argued that he has a well-founded fear of persecution from the Jamiat party. The Immigration Judge concluded that the applicant did not meet his burden of proving that he has a well-founded fear of persecution from the same faction that he assisted during its fight to overthrow the communist-supported government. The applicant stated that he fears persecution because he did not cooperate with the Jamiat party. Yet, we note that it was precisely his father's and his own assistance to the Jamiat party that was the source of their trouble with the communists. Accordingly, we find that the applicant has not shown that his fear of harm from the Jamiat party is reasonable. *Matter of Mogharrabi, supra*.

On appeal, the applicant further argues that he fears harm from other mujahidin factions because they will impute a pro-Jamiat political opinion to him. However, we find that the applicant has not met his burden of proving that his clandestine assistance in delivering flyers at night nearly 9 years ago when he was 16 years old would lead a reasonable person in his circumstances to fear harm from unidentified mujahidin factions on account of an imputed political opinion of being pro-Jamiat. We note that the applicant was never a Jamiat member, nor does he claim to have taken any action against any of the other mujahidin factions. His role in support of the Jamiat party was to topple the communist regime. Moreover, we note that the applicant has not been living in Afghanistan, nor has he taken any action formally identifying himself with any of the mujahidin factions during the past 9 years.

The applicant has not sufficiently demonstrated how other factions would identify him as a member of the Jamiat faction or why they would view him as an opponent. In fact, the applicant previously claimed that the Jamiat faction would persecute him, presumably because he would not be identified as a pro-Jamiat supporter. If the applicant truly believes that it is unlikely that the faction that he assisted would recognize him as one of their own, it seems unlikely that a different faction would impute a pro-Jamiat opinion to him.

In support of his argument, the applicant relies on reports by Amnesty International. One such report documents the civil strife gripping Afghanistan at the time of the hearing and discusses the revenge killings occurring among the various mujahidin factions. *See* Amnesty International, *Afghanistan-The Human Rights Crisis and the Refugees*, AI Index: ASA 11/02/95 (Feb. 1995) [hereinafter Amnesty International

Report]. The applicant also relies on statements in this Amnesty International Report that indicate that all sections of the population are at risk and those most at risk are members of specific ethnic, religious, or political groups in areas controlled by hostile warlords. However, the applicant has not adequately demonstrated that his situation is "appreciably different from the dangers faced by all his countrymen." *Sarvia-Quintanilla v. INS*, 767 F.2d 1387, 1394 (9th Cir. 1985). Additionally, we note that the 1995 Department of State *Profile* reported that the "principal risk for a returning Afghan would be random violence" and that highly visible leaders of political factions are more likely to be targeted because of their political opinion than those with lower visibility. *Profile, supra*, at 6. We do not dispute the Amnesty International Report's description of a violence-plagued Afghanistan. Nor do we dispute the evidence of the revenge killings occurring among the rival factions seeking to consolidate control over Afghanistan. Rather, we find that the applicant has not met his burden of proving that the various mujahidin factions might take reprisals against him based on his brief and minor role in assisting the Jamiat party in defeating the communists 9 years ago. *Matter of Mogharrabi, supra*.

Additionally, on appeal the applicant argues that he has a well-founded fear of persecution from the other mujahidin factions because they will impute a pro-Western political opinion to him simply because he has lived in the West and because he has sought asylum. The applicant has not provided sufficient support for his argument that Afghans who have lived in the West have been persecuted upon return to Afghanistan because they have been viewed as having pro-Western ideas or because they have sought asylum. Nor has he explained what would constitute "pro-Western ideas" that would be inimical to the mujahidin. The applicant refers to an Amnesty International Report that indicates Afghan asylum seekers could become the target of serious human rights violations upon return to Afghanistan. However, the applicant does not provide any support for his argument that asylum seekers suffer this harm because of an imputed political opinion, as opposed to the generalized civil strife that is afflicting Afghanistan. Nor has he explained how any factions will know that he has been an asylum seeker in the United States. Accordingly, we find that the applicant has not met his burden of proving that the various mujahidin factions will impute a pro-Western political opinion to him and persecute him for it merely because he has lived in the West or because he has sought asylum. *Matter of Mogharrabi, supra*.

**B. Discretionary Grant of Asylum on the Strength
of Past Persecution Alone**

**1. Analysis of 8 C.F.R. § 208.13(b)(1)(ii) (1998)**

The applicant also argues on appeal that 8 C.F.R. § 208.13(b)(1)(ii)

(1998) is not consistent with the Act. The applicant attacks the regulation's threshold requirement of "compelling reasons . . . arising out of the severity of the past persecution" for claims based on past persecution when there is no current "well-founded fear" showing. *See* 8 C.F.R. § 208.13(b)(1)(ii). The applicant contends that the Act does not limit discretionary consideration to the severity of the past persecution. In his motion to remand, the applicant also argues that he is entitled to a favorable exercise of discretion because of the "totality of the circumstances" surrounding his asylum claim.

First, we note that as an administrative body we are bound to uphold agency regulations. *Matter of Ponce de Leon*, 21 I&N Dec. 154, at 158 (BIA 1996, 1997; A.G. 1997) (vacated on other grounds on remand from Attorney General). Second, we find that the regulatory approach is consistent with the Act and the 1951 Convention. Finally, we find that applying 8 C.F.R. § 208.13(b)(1)(ii) as a threshold requirement is generally consistent with Ninth Circuit case law and our administrative precedent.

The Act gives the Attorney General discretion to grant asylum once the asylum applicant has established that he is statutorily eligible. *See* section 208(a) of the Act. The United States Court of Appeals for the Ninth Circuit has held that this is a "broad delegation of power, which restricts the Attorney General's discretion to grant asylum only by requiring the Attorney General to first determine that the asylum applicant is a 'refugee'" under the Act. *Komarenko v. INS*, 35 F.3d 432, 436 (9th Cir. 1994). The Attorney General has exercised that discretion in part by setting forth a threshold regulatory requirement in cases where the asylum applicant satisfies the "refugee" definition solely because of past persecution. As 8 C.F.R. § 208.13(b)(1)(ii) is a regulation promulgated by the Attorney General, it "has the force and effect of law as to this Board and Immigration Judges." *Matter of Ponce de Leon, supra*, at 158.

The language of 8 C.F.R. § 208.13(b)(1)(ii) also mirrors the language of Article 1C(5) of the 1951 Convention. As an exception to the cessation provision, Article 1C(5) of the 1951 Convention provides that the cessation provisions "shall not apply to a refugee . . . who is able to invoke compelling reasons arising out of previous persecution for refusing to avail himself of the protection of the country of nationality." The *Handbook* explains that the "exception, however, reflects a more general humanitarian principle" which could also be applied to refugees other than those limited by the Convention. *Handbook, supra*, para. 136, at 31. The *Handbook* acknowledges that an asylum applicant who "has suffered under atrocious forms of persecution should not be expected to repatriate. Even though there may have been a change of regime in his country, this may not always produce a complete change in the attitude of the population, nor, in view of his past experiences, in the mind of the refugee." *Id.*

Additionally, the Ninth Circuit has applied the regulatory language of

8 C.F.R. § 208.13(b)(1)(ii) as a threshold requirement. In *Kazlauskas v. INS*, 46 F.3d 902 (9th Cir. 1995), the court held that absent a well-founded fear of future persecution, "asylum is warranted for 'humanitarian reasons' *only* if [the applicant] demonstrates that in the past '[he] or his family has suffered "under atrocious forms of persecution."'" *Id.* at 906 (emphasis added) (quoting *Acewicz v. INS*, 984 F.2d 1056, 1062 (9th Cir. 1993) (quoting *Matter of Chen, supra*)), Additionally, our case law recognizes that an applicant may, in select circumstances and as a matter of discretion, be granted asylum solely on the basis of the severity of the past persecution. *See Matter of C-Y-Z-*, 21 I&N Dec. 915, at 919 (BIA 1997); *Matter of H-*, 21 I&N Dec. 337, at 16 (BIA 1996); *Matter of B-*, 21 I&N Dec. 66, at 72 (BIA 1995), Accordingly, we find that the threshold requirement of 8 C.F.R. § 208.13(b)(1)(ii) is consistent with the Act, the 1951 Convention, Ninth Circuit case law, and our administrative precedent.[7] *See Fook Hong Mak v. INS*, 435 F.2d 728 (2d Cir. 1970).

## 2. Application of 8 C.F.R. § 208.13(b)(1)(ii) (1998)

We turn to our case law for guidance to determine whether the applicant has demonstrated compelling reasons arising out of the severity of his past persecution for being unable or unwilling to return to Afghanistan. In *Matter of Chen, supra*, the asylum applicant's suffering began when he was 8 years old and continued until his adulthood. He endured physical, psychological, and social harm. He was permanently physically and emotionally scarred. In *Matter of B-, supra*, we found that where the applicant had suffered 3 months' detention in KHAD facilities, 10 months' detention in prison, and 4 months' involuntary military service, in addition to suffering sleep deprivation, beatings, electric shocks, and the routine use of physical torture and psychological abuse, the persecution was so severe that his asylum application should be granted notwithstanding the change of circumstances in Afghanistan.

As discussed above, the applicant here has met his burden of proving that he suffered past persecution. However, to demonstrate that he is eligible for asylum on the basis of his past persecution alone, the applicant must

---

[7]We recognized in *Matter of H-, supra*, that there are a variety of discretionary factors, independent of the circumstances that led to the applicant's refugee status, such as his age, health, or family ties, which are relevant to the ultimate exercise of discretion. Contrary to the arguments of the applicant's claim in his motion and on appeal, under the current regulations, these factors bear on the exercise of discretion in past persecution cases where a well-founded fear of persecution is presumed to exist because country conditions have not been shown to have changed or in cases where the "compelling reasons" requirement has been satisfied. Such factors, however, are not relevant in assessing whether the "compelling reasons" standard itself has been met, unless they are shown in some respects to arise from the past persecution.

also show that he belongs to the smaller group of persecution victims whose persecution (including the aftermath) is so severe that the "compelling reasons" standard has been met. 8 C.F.R. § 208.13(b)(1)(ii). In the present case, the applicant has not testified to the severe harm and the long-lasting effects of that harm as was evidenced in *Matter of Chen, supra*, and *Matter of B-, supra*. We acknowledge the traumatic sequence of events that the applicant witnessed and experienced from his month-long detention and beatings and from the disappearance and likely death of his father. However, given the degree of harm suffered by the applicant, the length of time over which the harm was inflicted, and the lack of evidence of severe psychological trauma stemming from the harm, we conclude that the applicant has not shown compelling reasons arising out of the severity of the past persecution for being unable or unwilling to return to Afghanistan. *Kazlauskas v. INS, supra*; 8 C.F.R. § 208.13(b)(1)(ii).

## VII. APPLICANT'S ARGUMENTS IN SUPPORT OF HIS MOTION TO REMAND

In his motion to remand, the applicant appears to continue his argument that the Service has failed to rebut the presumption that he no longer has a well-founded fear of harm from any source. However, his motion can also be construed to argue that even if the Service has rebutted the presumption, the applicant has sufficiently demonstrated that he has a well-founded fear of persecution from the Taliban. We find that remanding the proceedings is appropriate to further develop the applicant's claim that his religious beliefs and practices are in conflict with the fundamentalist approach of the Taliban. While we are not persuaded to remand proceedings based upon the applicant's fear of harm from the Taliban arising from his actual or imputed political opinion, he is not foreclosed from presenting evidence at a new hearing regarding his political opinion claim or any other issues that the Immigration Judge may conclude are relevant. Accordingly, we make no findings regarding the ultimate merits of the applicant's asylum claim as set forth in the motion.

## VIII. CONCLUSION

The record reflects that ordinary Afghan residents face a variety of dangers arising from the internal strife in Afghanistan. We recognize that the applicant would be subject to these same dangers. Whether great or small, many of these risks are the risks of the ordinary person in an area experiencing civil war or political upheaval. The applicant's arguments on appeal

ultimately fail, however, because he does not qualify for relief on the basis of past persecution alone. At his new hearing, the applicant will have the opportunity to demonstrate that he currently has a well-founded fear of persecution as that term has been interpreted by our precedent decisions. *See Matter of Mogharrabi, supra.*

**ORDER:** The appeal is dismissed.

**FURTHER ORDER:** The motion to remand is granted, and the record is remanded for further proceedings consistent with this opinion.

Vice Chairman Mary Maguire Dunne did not participate in the decision in this case.

*CONCURRING AND DISSENTING OPINION:* Lory D. Rosenberg, Board
Member

Distilled down to its basics, the majority opinion selectively invokes international refugee protection law in an effort to restrict granting asylum under domestic law. While I have no objection to granting the applicant's motion to remand for consideration of additional evidence for prudential reasons, I disagree with the reasoning relied on by the majority, both as it may affect the applicant on remand and as it inevitably will be applied to the future asylum claims made by other individuals. Therefore, I dissent from the majority's dismissal of the applicant's original appeal.

In dissenting, I am in agreement with the points made in the dissenting opinion of Board Member John Guendelsberger, joined by Board Chairman Paul W. Schmidt, and I will not reiterate their critique of the majority's interpretation of the regulation pertaining to past persecution as positing an "evidentiary," as opposed to a "humanitarian," presumption. Additionally, however, I find there to be other aspects of the majority decision that warrant an articulated response.

First, I believe that the majority acts ultra vires in limiting the reach of the regulations, and that the restrictions it imposes are contrary to the statute and the international law upon which the statute is founded. Second, I find that the majority's interpretation of how to determine a claim based on past persecution is at odds with our own precedent, which recognizes that the Immigration and Naturalization Service bears the burden of rebutting the presumption that a refugee who has been persecuted in the past has a well-founded fear of persecution, and that asylum is a humanitarian form of relief. Third, I conclude that the majority's interpretation of the impact of past persecution in this case is inconsistent with the rulings of the Supreme Court and the United States Court of Appeals for the Ninth Circuit, in which this appeal arises.

## I. BACKGROUND AND CIRCUMSTANCES OF
## PAST PERSECUTION

The applicant in the instant case is a refugee who suffered past persecution at the hands of the former Soviet-aligned government in Afghanistan on account of his support for democracy and freedom of religion. Specifically, the past persecution he suffered entailed his having experienced the kidnaping and disappearance of his father, and the forcible searches of his family home, ultimately leading to his own capture, detention, interrogation, and torture over a prolonged period.

The applicant's moderate religious and democratic political leanings as a practicing Moslem who believes firmly in individual freedom, as well as his family identity, led to his association with the Jamiat faction of the mujahadin and activities that resulted in his being persecuted. Similarly, both his religious and political leanings—Moslem and pro-democracy—made him identifiable to those holding different allegiances, and indisputably motivated the specific persecution he experienced in the past.

In resisting the former Soviet-supported government, the applicant, like his father before him, was associated with the Jamiat, which was part of a broad coalition of Islamic anti-Soviet factions, known as the mujahadin. It was this faction that his father had been assisting before he was kidnaped by the former secret police, known as the KHAD. It was this faction whose literature was found in the applicant's house by the KHAD. And, it was this faction that the applicant was assisting in distributing flyers that caused him to be taken into custody, detained, interrogated, and tortured by the KHAD for more than a month.

Present circumstances in Afghanistan reflect that conditions have changed since the time of the applicant's persecution. However, while the overthrow of the former Soviet-supported government in 1992 by the mujahadin led to the election of a member of the Jamiat faction for a 2-year term, it left the country subject to intense factional fighting based on the religious and political hostilities among the armed Islamic militia groups that once constituted the mujahadin. Since 1994, the Taliban, an ultra-conservative, extremist religious faction composed of some members of certain of the militia that once constituted the mujahadin, has seized control of the majority of the country. According to relevant reports of the Department of State, Afghanistan today is no closer to a constitutional democracy, and there is probably less respect for human or civil rights and tolerance of religious freedom under the Taliban, than under the previous Soviet-supported government that persecuted the applicant.

The severity of the past persecution experienced by the applicant includes the loss of his father, who was taken by the KHAD from the family home in 1988, and was never seen again. It also includes the detention, interrogations, and beatings of the applicant over a 1-month period, and the

questioning sessions during this period in which he was hit and kicked, and on at least one occasion, deprived of food for 3 days. It also includes the fact that, as the result of this intense persecution and torture, the applicant's body was entirely covered with bruises, that he suffered a deep wound in one leg, that he lost consciousness during interrogation and was hospitalized while in KHAD custody, and that when he was able to escape from the hospital, he required another 6 weeks of hospitalization. The severity of his past persecution also underlies his present fear of returning to Afghanistan because of the continued factional fighting, and because of the indisputable persecutory treatment meted out by the Taliban against proponents of democracy, religious moderation, and individual freedom, such as the applicant.

## II. THE PRINCIPLES OF ASYLUM AND ISSUES AT STAKE

I view the matter before us as raising the broad issue of how we construe our commitment to afford both discretionary asylum protection, and mandatory non-refoulement, to a refugee who has demonstrated that he or she already has suffered persecution.[1] Specifically, shall we restrict consideration for discretionary asylum and limit our duty not to return a victim of past persecution to those cases in which the identical agent of persecution and the identical event or threat that caused the refugee's flight continue to exist?

Is requiring a refugee who already has been persecuted to prove and reprove that he or she continues to be a refugee, as defined in section 101(a)(42) of the Immigration and Nationality Act, 8 U.S.C. § 1101(a)(42) (1994), what was intended by Congress when it enacted the Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102, and incorporated the provisions of the 1967 United Nations Protocol Relating To the Status of Refugees ("Protocol"), into domestic law?[2] *See* sections 208, 241(b)(3)(B) of the Act, 8 U.S.C. §§ 1158, 1231(b)(3)(B) (Supp. II 1996). Is that how the Supreme Court understood Congress' codification of the Convention and Protocol in the Refugee Act of 1980 when it compared "the broad class of refugees and

---

[1]Although the applicant persists in asserting the contentions he raised on appeal, I question the need for the majority's extensive elaboration of the application of the regulation to the applicant's original claim, given our decision to remand his case to the Immigration Judge.

[2]United Nations Protocol Relating to the Status of Refugees, *opened for signature* Jan. 31, 1967, 19 U.S.T. 6223, T.I.A.S. No. 6577, 606 U.N.T.S. 267 (entered into force Oct. 4, 1967; for United States Nov. 1, 1968). The Protocol itself incorporated by reference the provisions of the 1951 United Nations Convention Relating To the Status of Refugees, *adopted* July 28, 1951, 189 U.N.T.S. 150 (entered into force Apr. 22, 1954) ("Convention").

the subcategory entitled to § 243(h) relief"? *Cardoza-Fonseca v. INS*, 480 U.S. 421, 441 (1987) (citing *INS v. Stevic*, 467 U.S. 407, 428 n.22 (1984)), Is this what the court contemplated when it specified that section 208(a) "gives the Attorney General the authority to grant the broader relief to refugees . . . [and] corresponds to Article 34," which requires only that the applicant "show that he or she is a 'refugee'. . . . No further showing that he or she 'would be' persecuted is required."? *Id.* at 441; *see also Carvajal-Munoz v. INS*, 743 F.2d 562, 574 (7th Cir. 1984).

What part should recognition of volatile or fluctuating circumstances of political power in a given country play in our adjudication? How do basic factors of political, gender-based or religious dissidence or difference, and the continued or consistent intolerance for such dissidence or difference by an original or successor governments affect the refugee's status as a refugee? More fundamentally, do the cessation clauses in the Convention, on which the majority purports to rely for the restrictions they read into the regulation, actually call for the termination of refugee status where there has been a substitution of the "original persecutor" or the "particular threat." *See* Convention, *supra*, art. 1C(5)(referring to "*circumstances in connexion with which he has been recognized as a refugee* have ceased to exist" (emphasis added)); *cf.* Office of the United Nations High Commissioner for Refugees, *Handbook on Procedures and Criteria for Determining Refugee Status Under the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees* para. 135, at 31 (Geneva, 1992) [hereinafter *Handbook*].

By interjecting into our application of the existing regulation—and our precedent—new and narrowing concepts that require evidence of the continuation of a "particular threat" from an "original persecutor" as opposed to a "new source," the majority has acted to restrict access to asylum based on past persecution to refugees in whose countries "conditions" have been absolutely static. These restrictions have not been authorized by either Congress or the Attorney General, and they do not comport with global conditions in the latter decades of the 20th century. *Cf.* section 208 of the Act.

As Board Member Guendelsberger has illustrated in his dissenting opinion, there is no regulatory mandate and no evidentiary principle requiring the Board to reach the interpretation adopted by the majority, and, as I discuss below, there is no Board or Federal precedent warranting such an interpretation. The majority does not provide any policy or prudential justification for the interpretation they adopt, which I find to be contrary to our decisions in *Matter of Chen*, 20 I&N Dec. 16 (BIA 1989), which prompted 8 C.F.R. § 208.13(b)(1998) being promulgated by the Attorney General, and *Matter of H-*, 21 I&N Dec. 337 (BIA 1996), which addressed the application of the regulatory presumption based on past persecution. *See also Matter of C-Y-Z-*, 21 I&N Dec. 915 (BIA 1997); *Matter of B-*, 21 I&N Dec. 66 (BIA 1995).

As a practical matter, the questions before us are twofold. First, what factors are relevant in determining whether *to deny* asylum protection—by definition a humanitarian form of discretionary relief from deportation and removal—to a refugee who has been persecuted in the past? Second, what, if anything, will the Board require of the Immigration and Naturalization Service—the prosecuting party in the adversarial setting in which the Immigration Judges and the Board adjudicate requests for asylum—before declining to treat a refugee who has suffered past persecution, as a refugee?

### III. PAST PERSECUTION AND REFUGEE STATUS

In *Matter of Chen, supra*, at 18, we recognized:

> [I]t is clear from the plain language of the statute that past persecution can be the basis for a persecution claim, and the case law has acknowledged this, if not focused on it. *See Desir v. Ilchert,* 840 F.2d 723, 729 (9th Cir. 1988); *Blanco-Comarribas v. INS*, 830 F.2d 1039, 1043 (9th Cir. 1987); *cf. INS v. Cardoza-Fonseca, supra,* at 1218. Similarly, Immigration and Naturalization Service Operations Instruction 208.4 and the Service Worldwide Guidelines for Overseas Refugee Processing ("Guidelines") recognize that *past persecution and a well-founded fear of persecution are alternative methods of establishing eligibility for refugee status.* The Guidelines specifically point out that "*where a person claims to have been persecuted, he need only establish that objective fact . . . .*"

(Emphasis added.) This Board holding, which I note cites two decisions of the Ninth Circuit, comports with the Supreme Court's recognition that

> an alien must only show that he or she is a "refugee" to establish eligibility for relief. No further showing that he or she "would be" persecuted is required. Thus, as made binding on the United States through the Protocol, Article 34 provides for a precatory, or discretionary, benefit for the entire class of persons who qualify as "refugees . . . ."

*Cardoza-Fonseca v. INS, supra,* at 441.

Furthermore, despite recent scrutiny of United States' asylum policy, no recent legislative enactment has purported to modify the principle that a refugee who has demonstrated past persecution is presumed to have a well-founded fear of persecution in the future and should be granted protection unless the presumption has been rebutted by evidence of a change in country conditions to such an extent that a reasonable person in the applicant's circumstances no longer would have a fear of persecution. In fact, focusing on the forced family planning policies of China, Congress enacted legislation furthering that principle. *See, e.g.,* section 101(a)(42)(B) the Act, *as amended by* Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Division C of Pub. L. No. 104-208, § 601, 110 Stat. 3009-546, 3009-689 ("IIRIRA") ("[A] person who has been forced to abort a pregnancy or to undergo involuntary sterilization, or who has been persecuted

for failure or refusal to undergo such a procedure or for other resistance . . . *shall be deemed to have been persecuted on account of political opinion . . .*"(emphasis added)).

In particular, there has been no legislative enactment specifying that the presumption of persecution is rebutted simply because there may have been a substitution of the refugee's original or specific persecutor. Congress' enactment of related legislation, subsequent to the recent articulation of an administrative interpretation of our treatment of past persecution in *Matter of Chen*, *supra*, *Matter of B-, supra*, and *Matter of H-, supra*, suggests the absence of any intent contrary to the agency's existing interpretation. *See Lorillard v. Pons*, 434 U.S. 575, 580 (1978) (stating that "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change," citing Albemarle Paper Co. v. Moody, 422 U.S. 405, 414 n.8 (1975); *NLRB v. Gullett Gin Co.*, 340 U.S. 361, 366 (1951); *National Lead Co. v. United States*, 252 U.S. 140, 147 (1920); 2A C. Sands, Sutherland on Statutory Construction § 49.09 (4th ed. 1973)).

## A. Administrative Presumption of a Well-Founded Fear of Persecution

The applicant is not merely an asylum "applicant"—he is a *refugee* according to international law and to our own statutory definition codified at section 101(a)(42) of the Act. *See Desir v. Ilchert*, 840 F.2d 723, 729 (9th Cir. 1988) (stating that "past persecution, without more, satisfies the requirement of § 101(a)(42)(A), even independent of establishing a well-founded fear of future persecution" and "'[n]o further showing that he or she 'would be' persecuted is required.' *See Cardoza-Fonseca*, 107 S. Ct. at 1218; *see also*, 767 F.2d at 1453 (citing *Carvajal-Munoz v. INS*, 743 F.2d 562, 574 (7th Cir. 1984)"); *Matter of Chen, supra.* As a refugee, the applicant is within that "broad class" of persons who *qualify* as "refugees," and, at a minimum, he *may be granted* asylum as a matter of discretion. *INS v. Stevic, supra* at 428, n.22 (emphasis added); 8 C.F.R. § 208.13(b) ("The *applicant* may qualify as a *refugee* . . . because he or she has suffered past persecution . . . ." (emphasis added)).

In addition, some forms of past persecution also trigger a presumption that the applicant is entitled to withholding of deportation, which is mandatory. If an applicant's "'life or freedom was threatened in the proposed country of deportation, . . . it shall be presumed that [her] life or freedom *would be threatened* on return to that country.'" *Surita v. INS,* 95 F.3d 814, 821 (9th Cir. 1996) (emphasis added) (quoting 8 C.F.R. § 208.16); 8 C.F.R. § 208.16(b)(2) (1998).

The regulations specify that refugee status is presumed to continue "unless a preponderance of the evidence establishes that since the time the

persecution occurred *conditions . . . have changed to such an extent that the applicant* no longer has a well-founded fear of being persecuted if he or she were to return." 8 C.F.R. § 208.13(b)(1)(i); *see also* 8 C.F.R. § 208.16(b)(2). As a refugee whose life and freedom was threatened when he was seized, detained, interrogated, and tortured, the applicant is presumed by the regulations to be subject to future persecution. Even if the likelihood of future persecution is weaker than it was at the time he was persecuted, he remains a refugee. If conditions have changed to the extent that the presumption that he has a well-founded fear of persecution has been rebutted by a preponderance of the evidence, a refugee such as the applicant may be entitled to asylum as a matter of discretion. 8 C.F.R. § 208.13(b)(1)(ii).

In *Osorio v. INS*, 99 F.3d 928 (9th Cir. 1996), the Ninth Circuit stated:

> Under *Matter of Chen*, "a rebuttable presumption arises that an alien who has been persecuted by his country's government has reason to fear *similar persecution* in the future." Interim Decision 3104 at 4; *see Prasad v. INS*, 83 F.3d 315, 318 (9th Cir. 1996), If that presumption is not rebutted, the petitioner is eligible for asylum. Only if the presumption is rebutted must a petitioner demonstrate *"severe" past persecution or other humanitarian reasons* of the kind that the IJ insisted upon. *Matter of Chen*, Interim Decision 3104 at 4.

*Id.* at 932 (emphasis added) (footnote omitted).

## 1. Burden of Proof

If a refugee such as the applicant is to benefit from the so-called presumption of a well-founded fear of persecution for a fleeting moment in administrative adjudication time, we should honor his status as a refugee until and unless it has been shown that he has no reason to fear similar persecution. Certainly, it is unreasonable to charge the beneficiary of such a presumption with the responsibility for demonstrating that the circumstances giving rise to his status have changed to the extent that he no longer is a refugee. The majority's equivocal disclaimer regarding the fact that the Service bears the burden of rebutting the presumption that a once persecuted refugee remains a refugee is plainly contrary to our decision in *Matter of Chen, supra*, at 18, in which we stated, "Where past persecution is established by the applicant, *the Service ordinarily will have to present, as a factor militating against the favorable exercise of discretion*, evidence that there is little likelihood of present persecution . . . ." (Emphasis added), *Cf. Matter of N-M-A-*, 22 I&N Dec. 318-19, at 5 n.2 (BIA 1998).

Consequently, "[*a*]*s a practical matter, it will be the Service's burden to rebut the presumption*, whether by adducing additional evidence or resting upon evidence already in the record." *Matter of H-, supra*, at 15-16; *see also Matter of R-*, 20 I&N Dec. 621, 631 (BIA 1992) (Dunne dissenting) ("On the contrary, pursuant to 8 C.F.R. § 208.13(b)(1)(i) (1992), once past

persecution is established, an alien is presumed to have a well-founded fear of future persecution if he were to return to his homeland, *and the burden is on the Immigration and Naturalization Service to show otherwise by a preponderance of the evidence.*" (emphasis added) (citing *Singh v. Ilchert*, 801 F. Supp. 313, 322 (N.D. Cal. 1992))). Furthermore, in *Matter of C-Y-Z-*, *supra*, we stated:

> The applicant need not demonstrate compelling reasons for being unwilling to return resulting from the severity of the past persecution unless the presumption under 8 C.F.R. § 208.13(b)(1)(i) *has been rebutted by the Service*. *See* 8 C.F.R. § 208.13(b)(1)(ii); *see also Matter of H-, supra*, at 15-16. The regulatory presumption may be rebutted only by a showing, by a preponderance of the evidence, that since the time the persecution occurred, conditions in the applicant's country have changed to such an extent that the applicant no longer has a well-founded fear of persecution if returned to his home country. *Matter of H-, supra*.

*Id.* at 5-6 (emphasis added).

Contrary to the impression left by the majority's equivocation, there is little procedural mystery or ambiguity created by the fact that the regulations do not spell out specifically that the burden to rebut the presumption of persecution is on the Service. In contested asylum proceedings, the Service represents the United States—the signatory country to the Convention and Protocol—whose obligations to an individual who is a refugee by virtue of having been persecuted in the past are being determined under domestic law. As the Ninth Circuit stated in *Surita v. INS, supra*, at 821,

> To rebut this presumption, *the INS must show*, "by a preponderance of the evidence, that 'since the time the persecution occurred conditions in the applicant's country . . . have changed to such an extent that the applicant no longer has a well-founded fear of being persecuted if . . . [she] were to return.'" *Singh*, 69 F.3d at 378 (quoting 8 C.F.R. § 208.13(b)(1)(i)); *see also In re H-*, Int. Dec. 3276, 1996 WL 291910 at *8-11 (BIA May 30, 1996),

Moreover, despite the majority's implication that the existing regulation might require some other entity to bear the burden of rebutting the presumption that a once-persecuted refugee has a well-founded fear of persecution, pending regulations proposed by the Attorney General make clear that this is not a controversial point in her mind, nor in the view of the Service, which is not only the "party" who would bear the burden in proceedings before us, but is party to composing and promulgating the regulations. The explanatory information to the proposed regulations states, without hesitation, that

> [i]n cases involving past persecution, we propose *to maintain the use of a presumption and*, for cases in immigration proceedings, *the shifting to the Government of the burden of proof* for rebutting the presumption.

334

63 Fed. Reg. 31,945, 31,946 (1998)(emphasis added). Although it is contained in a prospective statement, reference to the Attorney General's view of where the burden lies provides strong guidance, and to my mind, should place that issue to rest. *See, e.g., Matter of Q-T-M-T-*, 21 I&N Dec. 639 (BIA 1996) (relying on Congress' specification of provisions for withholding of removal that were applicable prospectively, to determine the exercise of discretion in currently applicable provisions for withholding of deportation).

## 2. Essence of the "Rebuttable Presumption"

Although the regulation as promulgated clearly is meant to realize our commitments under international and domestic law, the majority's reading not only requires a refugee who would benefit from the regulatory "presumption" to first establish actual past persecution, but then—as a practical matter—to prove that the same, "particular threat" that resulted in his prior persecution at the hands of the same "original persecutor" has not ceased to exist. The majority's conclusion that evidence of a change in the "original persecutor" or "particular threat" overcomes the presumption and obviates a well-founded fear of persecution is in conflict with 8 C.F.R. § 208.13(b)(1), which contains no such limiting language.

If the majority purports to find that a previously persecuted refugee no longer qualifies for that status and is not entitled to be considered for asylum, it is essential that there be some evidence concerning how the alleged changes in conditions affect *that individual applicant. See Gonzalez v. INS*, 82 F.3d 903, 911 (9th Cir. 1996); *Acewicz v. INS*, 984 F.2d 1056, 1062 (9th Cir. 1993); *Castillo-Villagra v. INS,* 972 F.2d 1017, 1031 (9th Cir. 1992); *see also Fergiste v. INS*, 138 F.3d 14, 19 (1st Cir. 1998). In order to conclude that a refugee already subjected to persecution does not benefit from the presumption that he has a well-founded fear of future persecution, there must be some evidence to indicate both that conditions have changed and that the nature of those changes have diminished or extinguished the basis for his fear to the extent that a reasonable person would not fear persecution. *See also Matter of Mogharrabi*, 19 I&N Dec. 439 (BIA 1987) (holding that eligibility for asylum turns on a refugee's opinion or status that is known or could be known to the persecutor, for which he or she has experienced or could experience harm or mistreatment meant to change or extinguish that opinion or status). Such a determination requires an evaluation of subjective and objective factors relevant to the possibility of harm rising to the level of persecution, on account of race, religion, nationality, membership in a particular social group, and political opinion, by persecutors who represent the government or are outside the government's control. *Matter of Kasinga*, 21 I&N Dec. 357 (BIA 1996).

335

Significantly, nothing in the Convention, the *Handbook*, or the interpretations of the Ninth Circuit or the Board necessarily limit refugee status to the continued existence of the same government that was in existence at the time of the persecution suffered by the refugee in the past. The "cessation clause" on which the majority relies in attempting to justify its reading of the regulation as being in accord with the 1951 United Nations Convention Relating to the Status of Refugees and its interpretation by international scholars, refers to "*circumstances*" in relation to which the individual was recognized as a refugee. The term "circumstances" posits a concept far more broad than the "particular threats" or "original persecutors" language imposed by the majority.

The standard of "circumstances in connection with which [the refugee] has been recognized" under Article 1C(5) of the 1951 Convention has been interpreted as meaning, "*fundamental changes* in the country, which can be assumed to *remove the basis of the fear* of persecution." *See Handbook, supra*, para. 135, at 31 (emphasis added), The concept of "fundamental changes" that remove the basis of the applicant's fear also is far more expansive than the majority's reference to an "original persecutor" or a "particular threat." *See, e.g., Matter of O-Z- & I-Z-*, 22 I&N Dec. 23 (BIA 1998) (recognizing that while the 1996 Department of State report acknowledges that the present government speaks out against anti-Semitism, societal prejudices continued to exist and go unprosecuted).

In other words, cessation of a government policy that might have led to persecution under one government—in this case, the brutal squelching of efforts to achieve democracy and religious freedom under the Soviet-dominated government—does not automatically establish proof that the threat of such continued suppression does not continue under the current government. See also *Matter of Chen, supra*, at 18, in which we granted asylum based on the level of severity of the past persecution, and stated that given a situation in which governmental authorities that had persecuted the applicant's family under a prior administration had changed, a refugee who "has been persecuted in the past by his country's government has reason to fear *similar persecution* in the future." (Emphasis added.) Similarly, in *Gailius v. INS*, 147 F.3d 34, 36 (1st Cir. 1998), the First Circuit stated, "It is well established that *general changes in country conditions do not render an applicant ineligible for asylum when, despite those general changes, there is a specific danger to the applicant*." (Emphasis added.)

Even an outright change in government does not necessarily extinguish a well-founded fear of persecution. According to the First Circuit, "Abstract 'changed country conditions' do not automatically trump the specific evidence presented by the applicant. Rather, changes in country conditions must be shown to have negated the particular applicant's well-founded fear of persecution." *Fergiste v. INS*, supra, at 19 (citing *Vallecillo-Castillo v. INS*, 121 F.3d 1237, 1240 (9th Cir. 1996); *Osorio v. INS, supra*); *see also*

336

*De La Llana-Castellon v. INS*, 16 F.3d 1093, 1097-98 (10th Cir. 1994) (finding it error for the Board to take administrative notice of changed conditions without giving due regard for potential persecution from a group the government cannot control).

The majority's reliance on an unsupported reading of the internationally based cessation clause to narrow the presumption of persecution in the future is unfounded.[3] In the instant case, the applicant held a political opinion that favored democracy, individual freedom, and the ability to practice his religion without fear of repression or repercussions. The particular government that persecuted the applicant in the past was motivated to do so because it wished to eliminate or squelch his opposition to the lack of democracy and religious freedom typical of that totalitarian form of government. The current ruling forces wish to do the same.

The fact that the current forces that are likely to seek out the applicant can count among their members persons who also opposed the former government has little bearing on the applicant's well-founded fear of persecution. The plain, unrebutted facts are that the applicant continues to believe in and express support for democracy and freedom of religion, and that the present forces in control in Afghanistan—like the Soviet-backed government before them—unquestionably are motivated to oppose and penalize those who support democracy and freedom of religion. The applicant faces persecution on the same basis that he did previously.

For example, in *Matter of Izatula,* 20 I&N Dec. 149, 153-54 (BIA 1990), the Board found that "[t]he Country Reports explain that in Afghanistan, '[*c*]*itizens have neither the right nor the ability peacefully to change their government*. Afghanistan is a totalitarian state under the control of the [People's Democratic Party of Afghanistan], which is kept in power by the Soviet Union.'" (Emphasis added.) Some 8 years later, the current country report for 1997 indicates that "[t]here was no central government. The Pashtun-dominated ultra-conservative Islamic movement known as the Taliban controlled over two-thirds of the country." Committees on International Relations and Foreign Relations, 105th Cong., 2d Sess., *Country Reports on Human Rights Practices for 1997* 1605, 1605 (Joint Comm. Print 1998). It states in addition, "There is no constitution, rule of law, or independent judiciary." *Id.* As the Department of State recognizes, under the current "government" or faction currently in power,

---

[3]In citing Atle Grahl-Madsen's reference to "regimes" in his notable 1966 treatise, the majority neglects to note that the context of that work was obviously limited to the immediate post-World War II cold war period, which preceded both the United States' signing of the 1967 Protocol on the Status of Refugees, and the 1979 issuance of the *Handbook* on Procedures and Criteria for Determining Refugee Status, which has been followed internationally and used as guidance in the United States. *See, e.g., Cardoza-Fonseca v. INS, supra.*

"[t]he overall human rights situation is poor. *Serious human rights violations continue to occur and citizens were precluded from changing their government peacefully.*" *Id.* at 1606 (emphasis added).

Nevertheless, the majority disregards the underlying basis for the applicant's opposition to the communist-backed government—his political opinion favoring freedom of religion and democracy—and focuses on the fact that there has been a change in government. The fact that the record reflects that a change in government has introduced an arguably more virulent and oppressive government, and that the applicant is known to that government as an opponent of its goals, is similarly discounted. The majority sees only that the government has changed in name.

This is contrary to the way in which the Federal courts have read the regulation. Although the majority cites *Marquez v. INS*, 105 F.3d 374, 378 (7th Cir. 1997), for the proposition that asylum is intended to protect individuals from future persecution, the decision in that case did not involve past persecution involving detention and torture, but threats and the repossession of a boat, which the Seventh Circuit concluded amounted not to past persecution but to "bullying."[4] What is more, the majority neglects to acknowledge that the court actually stated that a "victim of anti-Islamic or anti-Christian oppression would not have a strong claim to asylum *if the oppression was clearly over—say, if a tolerant regime put an end to it* and the victim could return home safely." *Id.* at 374 (emphasis added). The majority also overlooks the court's complete statement that "the past serves as an evidentiary proxy for the future. . . . Yet, if the evidence shows that conditions . . . *have changed so dramatically* as to undermine the well-foundedness of that fear, that presumption disappears . . . ." *Id.* (emphasis added).

Moreover, as the Ninth Circuit emphasized in *Osorio v. INS, supra,* although adequate evidence of changed country conditions that is properly considered can rebut the presumption, the

> IJ took only cursory notice of the changes in Nicaragua and did not undertake the type of individualized analysis of Osorio's situation that we have found necessary to refute the presumption." *See Berroteran-Melendez v. INS,* 955 F.2d 1251, 1257 (9th Cir. 1991), Failure to recognize the existence of a presumption in Osorio's favor—much less to rebut that presumption in an individualized manner—constitutes an abuse of discretion requiring a remand.

---

I am at a loss as to why the majority would cite, as support for its position, this out-of-circuit decision in which the court soundly criticized the Board for the "jumble," "disorganization," and "twisted reasoning" of our articulation of the two main issues, past persecution and a well-founded fear of future persecution, which required a "highlighter and extensive annotations in the margins [to] resolve the muddle." *Marquez v. INS, supra,* at 378 (7th Cir. 1997).

*Id.* at 932-33 (emphasis added).

Ignoring the natural reading of the regulation, the majority foreshortens the application of our refugee and asylum law so that the established fact of an individual's past persecution only *might* have some bearing on our consideration of how he or she *might* fare in the future because the agent of persecution has changed. Yet, a "general change," even a change in government, is not necessarily a "fundamental change" in the circumstances in connection with which the applicant became a refugee. The application of such an interpretation of a "rebuttable presumption" bears little resemblance to today's world in which state power and titular governments change on a daily basis.

### 3. Practical Application of the Presumption by the Majority

As to the many asylum-generating countries in today's world, the majority's interpretation is one that will result in almost inevitable defeat of any asylum claim in which the applicant has experienced persecution in the past. As a practical matter, the majority's interpretation ignores the fact of past persecution and alleviates any burden on the Service to demonstrate that, as to this particular individual, persecutory conditions that triggered past persecution continue to exist. Instead, unless conditions have been absolutely static, the majority's reading essentially renders meaningless the regulatory language that conditions must have changed "to such an extent" that the refugee no longer has a well-founded fear of persecution. The burden is unlawfully thrown back upon the applicant, contrary to the regulation and the case law interpreting it. *Cf.* 8 C.F.R. § 208.13(b)(1)(i); *Fergiste v. INS, supra; Handbook, supra,* para. 136, at 31 (stating that "[e]ven though there may have been a change of regime . . . , this may not always produce a complete change in the attitude of the population, nor, in the view of his past experiences, in the mind of the refugee").

Suppose the applicant was a single female who lobbied against government-sponsored forced sterilization of women who were employed professionally by men who were not their husbands, and, as a result, she was persecuted and sterilized by the government. If a different government came into power and decreed that sterilized professional women should be forced into prostitution for government leaders, should the applicant be treated as a person who had nothing to fear under the "new regime," or as an individual who had to prove her case anew? I think not.

Or, suppose that the "particular threat" issued by the government was to stop publishing an opposition newspaper, and the applicant closed the newspaper down, but continued to protest the totalitarian government by posting pro-democracy leaflets and participating in pro-democracy demonstrations. Would his compliance with the "particular threat" or his flight

immediately after receiving the threat negate his well-founded fear of persecution? *Cf., e.g., Vera-Valera v. INS*, 147 F.3d 1036 (9th Cir. 1998); *Gonzales-Neyra v. INS*, 122 F.3d 1293 (9th Cir. 1997), *amended*, 133 F.3d 726 (9th Cir. 1998) (finding past persecution and a well-founded fear of persecution following the refugee's flight from the country after receiving a "particular threat"—the burning down of his video store and his own destruction), I think not.

In each of the preceding examples, persecution would have been established on the basis of the applicant's opinion or status. The governmental authority—even if it changed, or even if the applicant complied with one particular threat—would remain motivated to subject the applicant to persecution because the characteristic that triggered the original persecution did not change. In the present situation, although the original government that persecuted the applicant is no longer intact, this change in conditions has not resulted in a change in *circumstances* in which those believed to advocate free and democratic political and religious expression are no longer subject to persecutory treatment.[5] Certainly, the mere substitution of the governing regime in Afghanistan cannot be found determinative of the likelihood the applicant will face future persecution, as the change in regime has not changed—and may have escalated—the likelihood of suppression and oppression of those favoring democracy and religious freedom, such as the applicant.

The majority's reading into the regulation of an "individual persecutor" and a "particular threat" requirement would cut off refugee protection even under a purportedly modified standard such as that found in the proposed regulations. *See* 63 Fed. Reg. at 31,946 ("[T]he asylum officer or immigration judge may rely on *any evidence* relating to the possibility of future persecution against the applicant." (emphasis added)). It is important to note that the proposed regulation appears to broaden the circumstances in which country conditions per se have not changed, i.e., the government remains intact or continues to persecute dissidents, but asylum still can be denied because of a change in other circumstances that overcome the presumption of a well-founded fear of persecution. Yet, the proposed regulations do not expand the bases for denial of asylum in a situation in which the government has changed, but conditions have not improved or have worsened.

Realistically, refugee status—at least under our law as it exists today—cannot and should not be obliterated by technical requirements such as those the majority seeks to institute here. In the case before us, even if we overlook the fact that it is the Service that must rebut the fact that a once-per-

---

[5]Although there is now no official, recognized government, this does not foreclose asylum. *See Matter of H-, supra.*

secuted refugee who is a proponent of democracy and freedom of religion has a basis to fear persecution under current conditions in Afghanistan, the conditions and circumstances in Afghanistan support finding affirmatively that the applicant continues to have a well-founded fear of persecution.

### B. Discretionary Asylum Based on the Severity of Past Persecution

*In Matter of H-, supra*, at 347, we attempted to distinguish the Service's burden related to rebutting the presumption of future persecution from the applicant's "burden of establishing that the favorable exercise of discretion is warranted," citing *Matter of Pula*, 19 I&N Dec. 467 (BIA 1987), and *Matter of Shirdel*, 19 I&N Dec. 33 (BIA 1984). We stated that "[i]n exercising discretion, the Board has considered it appropriate to examine the totality of the circumstances and actions of an alien in his or her flight from the country where persecution is feared." *Matter of H-, supra*, at 347. In the event that an individual who has established that he is a refugee based on past persecution is shown not to have a well-founded fear of persecution, the determination whether to grant asylum falls within the exercise of discretion that we engage in when determining whether or not to grant asylum. *Matter of Chen, supra; see also Surita v. INS, supra.*

The Ninth Circuit recognizes that in determining whether asylum should be granted based on the severity of past persecution, the circumstances surrounding the persecution may provide an independent humanitarian ground for granting asylum. *See Osorio v. INS, supra*, at 932 (considering the "*Chen* doctrine" to allow granting asylum on the basis of severe past persecution or for other humanitarian reasons). In *Rodriguez-Matamoros v. INS,* 86 F.3d 158, 161 (9th Cir. 1996), the court emphasized our conclusion in *Matter of Chen, supra*, that,

> [w]hile the likelihood of future persecution is a factor to consider in exercising discretion in cases where an asylum application is based on past persecution, asylum may in some situations be granted where there is little threat of future persecution. Moreover, as with any case involving the exercise of discretion, all other factors, both favorable and adverse, should also be considered, with recognition of the special considerations present in asylum cases.

*See also Lopez-Galarza v. INS*, 99 F.3d 954 (9th Cir. 1996).

The Ninth Circuit's understanding of the "special considerations" constituting a factor in determinations based solely on past persecution is consistent with the proposed regulations just issued by the Attorney General, in which she explains that "the existing regulation may represent an overly restrictive approach to the exercise of discretion in cases involving past persecution but no well-founded fear of persecution." 63 Fed. Reg. at 31,947. Indicating that "[t]he Department believes it is appropriate to broaden the

standards for the exercise of discretion in such cases," *id.*, the proposed regulation goes on to include consideration that a refugee who faces "a reasonable possibility of serious harm," harm that would be "so 'serious' as to equal the severity of persecution," might warrant a discretionary grant of asylum. *Id.*

I note specifically that the proposed regulation cites *Matter of B-, supra,* a decision of the Board involving a refugee from Afghanistan who suffered persecution under the previous Soviet-supported government but was granted asylum based on both the severity of past persecution and the current civil strife in that country, as an example of how the "broadened" proposed regulation might apply. In addition, I note that the Ninth Circuit has chastised the Board more than once concerning the need to refer to its decision in *Desir v. Ilchert, supra*, and not to limit asylum grants based solely on past persecution to the level of atrocious treatment present in *Matter of Chen, supra. See Lopez-Galarza v. INS, supra; Kahssai v. INS,* 16 F.3d 323 (9th Cir. 1994).

In *Kahssai*, the Ninth Circuit emphasized that in assessing the severity of past persecution, the fact that the particular circumstances in *Matter of Chen* constitute "a sound example of asylum based on past persecution does not mean that it established the applicable standard for evaluating all such asylum claims." *Kahssai v. INS, supra*, at 329 (Reinhardt, concurring) (noting that the "BIA's narrow focus on the atrocities described in *Chen* is in disregard of this court's decision in *Desir v. Ilchert*"), Relevant factors include experiences such as the "'beatings, imprisonment, and assaults by government security forces for the purpose of extortion,'" as well as other equally serious forms of persecution that need not involve physical harm, but that adversely affect personal, religious, or gender-based identity. *Id.* (quoting *Desir v. Ilchert, supra,* at 724).

Given these factors, although not addressed by the majority, I would also grant asylum based on the severity of past persecution and the humanitarian considerations present in the instant case. The applicant's mistreatment was not unlike that experienced by the applicant in *Matter of B-, supra*. Each refugee was apprehended, detained, interrogated, tortured, and held in jail by the Soviet-backed government in Afghanistan for a significant period of time. Each experienced the mental anguish of his father being captured by the KHAD and never being heard from again. Each would face the possibility of equally serious harm under the current conditions of civil strife—or in the applicant's case—Taliban faction dominance, in Afghanistan. In *Matter of B-, supra*, at 72, we concluded:

> Moreover, the applicant's experiences during his detention and imprisonment must have been exacerbated by his ignorance of his father's fate and his separation from the rest of his family. Therefore, given the persecution which the applicant suffered for such a long period, and the current civil strife in Afghanistan, we conclude that the applicant warrants a grant of asylum.

Although the applicant was in jail for 1 month rather than 13 months, the time the refugee in *Matter of B-* was detained, being subjected to interrogation and torture over such a period not only constitutes a severe form of persecution, but resulted in the applicant's suffering a significant injury that required a lengthy period of hospitalization. In addition, he faces being returned, not merely to conditions of civil strife, but to domination by an avowed ultra-conservative Islamic force to whom his moderate Moslem beliefs and democratic leanings would be considered sacrilege and treason. *See also Desir v. Ilchert, supra*. Therefore, I conclude that the applicant's experience was of "comparable severity" to that suffered by the applicant in *Matter of B-, supra*, and that granting asylum is warranted in his case. *Lopez-Galarza v. INS, supra; Kahssai v. INS, supra*, at 329.

## IV. CONCLUSION

Neither the terms of the Convention and Protocol, their interpretation by the *Handbook*, nor the statute or the language of the regulation contain any of the explicit, additional restrictions that the majority attempts to impose in this case. The regulation—which does little more than embody our precedent as articulated under *Matter of Chen, supra*—requires a showing that the change in conditions has been "to such an extent that the applicant no longer has a well-founded fear of being persecuted." 8 C.F.R. § 208.13(b)(1)(i). Furthermore, the regulatory requirement that conditions have changed is not satisfied by showing a change in government alone. At a minimum, under controlling Ninth Circuit law, to rebut the presumption that the applicant has a well-founded fear of persecution, the Service must demonstrate that country conditions are such that the individual applicant can return to his country in safety and without facing a likelihood of harm.

The majority would limit asylum to only those refugees who appear likely to experience in the future the very same harm they experienced in the past, at the same level they experienced it in the past, at the hands of the same persecutor. Were this a reasonable or appropriate restriction, the statute, the regulation and the standards we apply would be quite different. Such an interpretation impermissibly alleviates the burden on the Service and turns the whole notion of a rebuttable presumption on its head. Notably, it is contrary, not only to existing readings of the current regulations which do not restrict asylum based on past persecution to the continued likelihood of a "particular threat" from an "original persecutor," but is at odds with regulations proposed by the Attorney General.

Finally, the majority disregards the applicant's eligiblity for asylum as a matter of discretion based on the comparable severity of the past persecution he suffered. Consequently, I dissent.

*CONCURRING AND DISSENTING OPINION:* John W. Guendelsberger, Board Member, in which Paul W. Schmidt, Chairman, joined

I respectfully concur in part and dissent in part.

I agree that the record in this case should be remanded for additional evidence. I disagree with the majority's approach to allocation of the burden of proof on remand.

I dissent from the majority's holding that the regulation at 8 C.F.R. § 208.13(b)(1)(i) (1998) applies only to well-founded fears that have some connection to the past persecution. The regulatory language requires that once past persecution has been established, the Immigration and Naturalization Service must produce evidence that the "applicant no longer has a well-founded fear of being persecuted if he or she were to return." *Id.* The regulatory language does not limit the Service's burden to those fears that relate to the previous sources of persecution.

The majority characterizes the regulation at issue as an "evidentiary presumption" based on past persecution. It then concludes that the only sensible construction of the regulation is to limit its applicability to well-founded fears directly arising from the past persecution. This analysis begs the question whether the regulation may also have a humanitarian purpose. Shifting the burden to the Service affords an additional measure of protection in very close cases to those asylum applicants who have already demonstrated past persecution. *See Medina v. California*, 505 U.S. 437, 449 (1992) (stating that the allocation of the burden of proof is significant in the "narrow class of cases where the evidence is in equipoise"). Affording an additional measure of protection against erroneous decisions in such cases is a rational and humanitarian approach to asylum adjudication.

The majority claims that its analysis of 8 C.F.R. § 208.13(b)(1)(i) is based on the forward-looking posture of asylum law. However, this position overlooks the well-established principle that victims of past persecution are eligible for asylum in a number of situations without regard to well-founded fear of future persecution. As noted in the concurring opinion in *Matter of Chen,* 20 I&N Dec. 16 (BIA 1989):

> It bears emphasizing in addition that at the time the Convention came into effect, the majority of the refugees covered by the Convention were victims of past persecution in Europe, which persecution clearly had ceased with the defeat of the Axis powers. It is thus apparent to me that the historical underpinnings of the Convention, from which the Refugee Act of 1980 receives its genesis, would have to be totally ignored if one were inclined to adopt the position that present likelihood of persecution is also required where past persecution has been established.[1]

[1]The regulation at issue in this case, first promulgated in 1990, partly adopted and partly modified the approach to past persecution which was outlined by the Board in *Matter of Chen, supra*. The *Chen* decision made clear that proof of past persecution alone established

*Id.* at 24 (Heilman, concurring). Another more recent example of the eligibility for asylum based on past persecution is the expansion of the definition of the term "refugee" to include a person who has been forced to abort a pregnancy or to undergo involuntary sterilization without reference to whether the alien has a well-founded fear of future persecution. *See* section 101(a)(42) of the Immigration and Nationality Act, 8 U.S.C. § 1101(a)(42) (Supp. II 1996).

Additionally, the majority relies upon wording in the cessation clauses in the 1951 United Nations Convention Relating to the Status of Refugees, *adopted* July 28, 1951, 189 U.N.T.S. 150 (entered into force Apr. 22, 1954), in support of its narrow interpretation of 8 C.F.R. § 208.13(b)(1)(i). It does so, however, without also examining the termination provision of section 208(c)(2) of the Act, 8 U.S.C. § 1158(c)(2) (Supp. II 1996), and its implementing regulations. Section 208(c)(2)(A) provides that asylum, once granted, may be terminated if the Attorney General determines that the alien is no longer a "refugee" within the meaning of section 101(a)(42), "owing to a fundamental change in circumstances." The implementing regulation specifies that before the Service may terminate a grant of asylum made under the jurisdiction of an Immigration Judge for changed circumstances, "the Service must establish, by a preponderance of the evidence" that "the alien no longer has a well-founded fear of persecution upon return due to a change of country conditions in the alien's country of nationality or habitual residence." 8 C.F.R. §§ 208.22(a)(3), (e) (1998). This directive for termination of asylum closely parallels the language found in 8 C.F.R. § 208.13(b)(1)(i). Were the majority rationale to be applied in termination proceedings, the Service's burden would be narrowly confined to demonstrating that the particular source of the past persecution had disappeared. I cannot agree that the Service would meet its burden in a termination proceeding by showing only that the regime in control at the time of the applicant's grant of asylum was no longer in existence. An equally important aspect of the well-founded fear issue is the nature and stability of the new regime and how the asylee will be characterized and perceived by that

---

*eligibility* for asylum. The Board noted that in such cases the question of the likelihood of present persecution remained relevant to the exercise of discretion in granting asylum. In specifying guidelines for how such discretion should be applied, the Board noted that "a rebuttable presumption arises that an alien who has been persecuted in the past by his country's government has reason to fear similar persecution in the future." *Id.* at 18. The Board then noted that "there may be cases where the favorable exercise of discretion is warranted for humanitarian reasons even if there is little likelihood of future persecution." *Id.* at 19 (referring to paragraph 136 of *The Handbook on Procedures and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees* (Geneva, 1988) [hereinafter *Handbook*].

regime. If the alien comes forward with evidence of fear of persecution under the new regime, the termination regulation, as well as the regulation at issue in this case, places upon the Service the ultimate burden of proof as to well-founded fear.

The majority's reliance on the Convention and *Handbook* is inapposite and misleading. The Convention's 5th cessation clause at Article 1C, which contains the "connexion" language relied upon by the majority, has no bearing on allocation of burden of proof. Nor does the *Handbook* provision at paragraph 135 provide any guidance as to placement of the burden of proof in determining whether the reasons for granting refugee status continue to exist. Nothing in the Convention, Protocol, or *Handbook requires* a shift of the burden from the alien to the Government in application of the cessation provisions. The Act or regulations could just as well have imposed a continuing burden upon the alien, when called upon, to demonstrate continuing qualification as a "refugee." The Attorney General, however, determined that once refugee status has been established, it will not be terminated unless and until the Service can prove that changed conditions have eliminated fear of persecution. 8 C.F.R. § 208.22. This allocation of the burden of proof reflects a judgment concerning allocation of risk of error between litigants. The applicant presenting an initial claim must produce evidence that establishes that he meets the definition of refugee. Once awarded, the burden is placed upon the Service to show that the status is no longer justified.

Similar shifts in burden of proof are applied in many other areas of immigration law in the event that revocation of a status or privilege is sought. An applicant for naturalization, for example, has the burden of demonstrating that he meets all the requirements for citizenship. In a denaturalization proceeding, however, the burden of proof shifts to the Government and the standard is also elevated beyond that of a preponderance of the evidence. *See Schneiderman v. United States*, 320 U.S. 118, 124 (1943) ("To set aside such a grant the evidence must be 'clear, unequivocal, and convincing'—'it cannot be done upon a bare preponderance of evidence which leaves the issue in doubt.'" (quoting *United States v. Maxwell Land-Grant Co.*, 121 U.S. 325, 381 (1887)). Likewise, in rescission of adjustment of status, the Government bears the burden of proving ineligibility for adjustment by clear, unequivocal, and convincing evidence. *See, e.g., Waziri v. INS*, 392 F.2d 55 (9th Cir. 1968); *Matter of Suleiman*, 15 I&N Dec. 784 (BIA 1974), Also, in expatriation cases when the citizenship claimant proves either his birth in the United States or acquisition of his citizenship through naturalization, the burden shifts to the Government to demonstrate by clear, unequivocal, and convincing evidence that the individual committed a voluntary act of expatriation. *Mitsugi Nishikawa v. Dulles,* 356 U.S. 129 (1958); *Gonzales v. Landon*, 350 U.S. 920 (1955). Thus the shifting of the burden of proof in termination of asylum cases is

not at all unusual, and there is little justification for narrowly applying the burden shift to just those aspects of persecution upon which the original grant of asylum was based. The nearly identical language of the 8 C.F.R. § 208.13(b)(1)(i) burden shift should also not be artificially constricted to apply only to fears arising from the past persecution.

Although no decision has directly addressed the question of the scope of the 8 C.F.R. § 208.13(b)(1)(i) burden shift, a number of courts and this Board have noted that the burden is on the Service. Recently, in *Matter of H-*, 21 I&N Dec. 337 at 346 (BIA 1996), this Board held:

> To overcome the regulatory presumption, the record must reflect, by a preponderance of the evidence, that since the time the persecution occurred, conditions in the applicant's country of nationality . . . have changed to such an extent that the applicant no longer has a well-founded fear of being persecuted if he or she were to return to that country. 8 C.F.R. § 208.13(b)(1)(i), As a practical matter, it will be the Service's burden to rebut the presumption, whether by adducing additional evidence or resting upon evidence already in the record.

*See also Pitcherskaia v. INS*, 118 F.3d 641 (9th Cir. 1997) (stating that the Service bears the burden to rebut the 8 C.F.R. § 208.13(b)(1)(i) presumption by a preponderance of the evidence); *Osorio v. INS,* 99 F.3d 928 (9th Cir. 1996).

The limitation the majority proposes could have easily been included in the regulatory formula had that been intended. Notably, the very next subsection of the regulation, 8 C.F.R. § 208.13(b)(1)(ii), includes language limiting that clause's applicability to compelling reasons "*arising out of* the severity of the past persecution." (Emphasis added.) Thus, the drafters of the regulation were perfectly capable of including limitations on the scope of the evidentiary rules in asylum hearings. Had the drafters meant to similarly limit the scope of the regulation here at issue to "fears arising out of the past persecution," they would have so specified.[2] This Board should be particularly cautious when imposing limitations upon procedural or evidentiary regulations which afford safeguards to aliens seeking asylum. *See INS v. Errico*, 385 U.S. 214, 225 (1966) (indicating that doubts as to the correct construction of the statute should be resolved in the alien's favor even when interpreting provisions related to relief from deportation); *see also INS v.*

---

[2]The explanatory language in the final Rules and Regulations, which included the language of 8 C.F.R. § 208.13(b)(1)(i) for the first time, placed the Service's burden in very broad terms: "If the applicant establishes past persecution, the burden is then on the government to show (by a preponderance of evidence) that conditions have changed so substantially that the applicant would not have a well-founded fear if he were to return." Asylum and Withholding of Deportation Procedures, 55 Fed. Reg. 30,674, 30,678 (1990) (Supplementary Information) (now codified at 8 C.F.R. § 208.13(b)(1)(i)).

*Cardoza-Fonseca*, 480 U.S. 421, 449 (1987) (noting the "longstanding principle of construing any lingering ambiguities in deportation statutes in favor of the alien"); *Fong Haw Tan v. Phelan*, 333 U.S. 6, 10 (1948) (stating that any doubts regarding the construction of the Act are to be resolved in the alien's favor); *Matter of Tiwari*, 19 I&N Dec. 875 (BIA 1989).

The majority holds that the 8 C.F.R. § 208.13(b)(1)(i) presumption requires the Service to prove only that "the particular threat" no longer exists, i.e., that the applicant no longer has a well-founded fear from "his original persecutors." At other parts of the decision, the majority suggests that the Service's burden would not apply in the case of "any new source" but then qualifies this statement by noting that it would not apply if the new leadership harbored the "same animosities" as the old. What we are left with, in place of the regulation's bright-line rule regarding burden of proof once past persecution is demonstrated, is an ambiguous preliminary assessment of the "relationship" of well-founded fear to the past persecution. This adjustment of the plain regulatory language needlessly complicates the workings of the regulatory presumption and removes an evidentiary protection that was afforded to all aliens who have suffered past persecution.

In the instant case, it is undisputed that the applicant was terrorized by the communist secret police because of his assistance to one of the mujahidin factions. First, his father was taken by the secret police in the middle of the night and subsequently "disappeared." Second, the applicant was arrested and detained for approximately 1 month. During this detention, the applicant was beaten so severely that he lost consciousness and was hospitalized. Since his departure from Afghanistan, that country has been devastated by a brutal civil war in which the various factions of the mujahidin are attempting to destroy each other in order to gain control of the country.

While it is clear that the communists who persecuted the alien are no longer in control, the applicant has produced evidence that indicates that he may have a well-founded fear of persecution from other sources who continue in the political and military struggle for control of Afghanistan. The Immigration Judge below imposed the burden upon the applicant to show that he currently faces a well-founded fear of persecution from the warring factions in Afghanistan. I would find, for the reasons stated above, that the Service has the burden to demonstrate that the applicant's claimed fears of persecution in Afghanistan are not well founded. I would therefore remand this case for proper allocation of the burden of proof under 8 C.F.R. § 208.13(b)(1).