Tommy R. OSORIO, Petitioner,

v.

IMMIGRATION AND
NATURALIZATION SERVICE,
Respondent.

No. 95–70764.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 11, 1996.

Decided Nov. 6, 1996.

Xavier J. Vega, Los Angeles, California (on the brief) and Simon Salinas, Santa Ana, California (argued), for petitioner.

Jeffrey J. Bernstein (on the brief) and Linda Wernery (argued), Office of Immigration Litigation, United States Department of Justice, Washington, D.C., for respondent.

Before PREGERSON, BOOCHEVER, and REINHARDT, Circuit Judges.

REINHARDT, Circuit Judge:

Tommy Osorio, a native and citizen of Nicaragua, petitions this court for review of a final order of the Board of Immigration Appeals ("BIA" or "Board") denying his request for asylum and withholding of deportation. We conclude that neither the Board nor the immigration judge gave specific and cogent reasons for their finding that Osorio was not a credible witness. We also conclude that both the Board and the immigration judge erred as a matter of law in failing to recognize that asylum applicants who have demonstrated past persecution are presumptively eligible for asylum. Accordingly, we remand for further proceedings.

**BACKGROUND**

Osorio entered the United States without inspection on July 1, 1986. On August 5, 1987, he filed an application for asylum and withholding of deportation. The application was denied in March of 1989. At his deportation hearing, Osorio conceded deportability but renewed his request for asylum and withholding of deportation. His evidence consisted of his initial application for asylum, a second asylum application and accompanying affidavit prepared in May of 1989, a document from the United Nations High Commissioner for Refugees certifying Osorio as a refugee, and another document from the Honduran Red Cross identifying Osorio as a refugee.

The contents of Osorio's initial application are garbled and difficult to understand. Although Osorio testified that someone named Herman Lopez had assisted him in preparing his initial application, it is clear from the application that neither Lopez nor Osorio was fluent in English. For example, in response to the question of what he believed would happen to him if he were to return to Nicaragua, Osorio's application reads: "THE MILITARY SERVICES OBLIGATORY OF THE SANDINISTS IMMEDIATE KILLER ME." In response to the question whether Osorio or any member of his immediate family had ever belonged to any organization in Nicaragua, the application reads:

I WAS MEMBER OF THE SANDINISTS YOUNG PEOPLE BUT I WAS MEMBER TO THE FORCES, BECAUSE THE GOVERNMENT PRESENT CONDITION ME TO ORGANIZATED WITH THIS ORGANIZATION FOR CAN BE O.K. WITH THE COMMUNISTS SISTEMS, I WAS MEMBER FROM 1979 TO 1981.

In May of 1989, shortly before his deportation hearing, Osorio prepared a second application that he was not permitted to submit to the INS. The second application and accompanying affidavit were not only more intelligible than the first application, but also more responsive and specific. For example, in response to the question whether Osorio or any immediate family member had been mistreated by the Nicaraguan authorities, Osorio's first application read:

WE ARE THE MEMBER OF THE FAMILY OSORIOS BROTHERS WERE TORTURES IN MANY OCCASION BY THE ARMY FORCES BECAUSE WE DON'T GAVE THE MILITARY SERVICES TO THE FORCES, WERE VERY PERSECUTED.

By contrast, Osorio's second application read:

IN 1983, during the months of January and September, I was detained, interrogated and tortured by the agents of the Sandinista State Security Police. Other members of my family were incarcerated too. (PLease see attached affidavit).

(Capitalization in original.) In the accompanying affidavit, Osorio detailed specific occasions on which his house had been raided by state security forces and on which he was detained and interrogated by police. Osorio described his own "political opinion and activism in the political cadres" of the Nicaraguan Democratic Movement (MDN) and his family's "background of strong opposition" to the Sandinista regime, noting particularly that his uncle had been incarcerated and brutally tortured for providing aid to the Contras.

Osorio also described his mistreatment by authorities in some detail, recounting how members of the Sandinista Defense Block Committee (CDS) spray-painted his house with the slogan "The Osorios are Contras" and identifying a particular CDS official responsible for "constant harassment and intimidation" and who twice accused him of hiding weapons for the Contras. The affidavit set forth three additional occurrences, as follows. In June of 1982, Osorio was beaten and stoned at school by members of the Sandinista Youth who were "organized and supported" by his political economy professor, who had accused Osorio of being a "counterrevolutionary and reactionary." In 1982, Osorio also participated in a political rally in Nandaime, Nicaragua. In July of 1983, his family was denied a food ration card and was forced to purchase food on the black market.

Osorio's hearing testimony supplied additional detail. Osorio testified that he had participated in monthly demonstrations between 1982 and 1984, and that he had "prepared propoganda [sic] and flyers" and helped to recruit new members. He testified that "[m]embers of the CDS came and screamed at me and my family that we were going to die." With respect to the second occasion on which he was detained by state authorities, Osorio described being beaten on the back "[a]bout 12 times" with sticks approximately one-and-one-half feet in length, and being told by the state police that the beating was on account of his membership in the MDN. Osorio also elaborated that when his family was denied its food ration card, a CDS coordinator told him that "we didn't have any rights, and if we wanted to eat, we should ask for food from Mr. Reagan." Finally, Osorio asserted for the first time that three of his colleagues in the MDN had been killed by state security forces, and that he feared for his own life as a result.

The INS called as its only witness Anna Villanueva, the immigration examiner who interviewed Osorio on his first application for asylum. Villanueva could not recognize Osorio and could not remember having interviewed him. Instead, she identified the handwriting, signature, and notations on Osorio's application as her own and testified as to the usual manner in which she conducted such interviews and the meaning of the notations that she would employ. Although the placement of the notations on the application, combined with various "X" marks, suggests that Osorio may have contradicted his application in certain respects during the interview, Villanueva herself was unable to match these notations to their respective questions:

Q. I'd like to refer you to question number 39 where it asks the question, if the person filling out the application had ever traveled or resided in any other country before entering the United States. And you put claims never. Would you have asked him that question? If he had ever resided in the United States or in a third country?

A. I'm not sure if claims never was for question number 38 or 39.

Q. You put it above the question on number 36.

A. Right.

Q. Would you have put it above or on the question number 38 or 39?

A. I really can't tell because on question number 39, I checked off yes, and I've written in there in handwriting, 2 months in Honduras.

Villanueva testified that her spoken Spanish was "not perfect" but that it was her practice to reschedule an interview if an interpreter was required. She further testified that she could neither recall nor estimate how long she spent on interviews; that she could neither recall nor estimate how many interviews she had conducted in total; that she had only two to four weeks of experience in interviewing asylum applicants at the time she interviewed Osorio; and that, by the time of the hearing, she had ceased conducting such interviews altogether. Osorio testified in response that the interview had lasted "about five minutes" and that he could not recall being asked for any information other than his name and nationality.

In an oral decision, the immigration judge denied Osorio's request for asylum and withholding of deportation. In support of his finding that Osorio was "not a credible wit-

ness," the IJ asserted that Osorio's hearing testimony was "inconsistent" with both his first application and his affidavit, and that there were "significant inconsistencies between the first and second application" for which Osorio had "failed to provide a reasonable explanation." By contrast, the IJ found Villanueva's testimony "credible" and stated that "[i]n the absence of credible evidence to the contrary," he would "presume" that she had "lawfully performed her duties." Although his decision summarized Osorio's testimony, the IJ did not identify any of the inconsistencies on which his adverse credibility determination rested; nor did he identify what facts or inconsistencies, if any, were established by Villanueva's testimony. The IJ also held that, even assuming that Osorio had experienced persecution in Nicaragua, he would not be presumptively eligible for asylum:

> Even if one were to assume that the respondent did experience persecution in Nicaragua or that at the time he left that country and for some time thereafter, he had a well-founded fear of persecution should he return, it is not established that he presently warrants a grant of asylum.

The IJ added that, absent a "reasonable likelihood of present persecution," asylum could be granted only "if the past persecution had been so severe that return to the country of persecution would be inhumane" or if some "other humanitarian or compelling basis" existed.

The Board of Immigration Appeals rejected Osorio's appeal. In a two-page order devoid of any analysis of Osorio's particular situation, the Board stated that the IJ had "adequately and correctly addressed the issues raised on appeal" and affirmed the IJ's credibility finding "based upon and for the reasons set forth in his decision." Because the Board adopted the reasoning and conclusions of the IJ as its own, it is the IJ's decision that this court reviews. *Alaelua v. INS*, 45 F.3d 1379, 1382 (9th Cir.1995); *Yepes–Prado v. INS*, 10 F.3d 1363, 1366–67 (9th Cir.1993).

## ANALYSIS

■ We review credibility findings under a substantial evidence standard: "We do not accept blindly an IJ's conclusion that a petitioner is not credible. Rather, we examine the record to see whether substantial evidence supports that conclusion and determine whether the reasoning employed by the IJ is fatally flawed." *Aguilera–Cota v. INS*, 914 F.2d 1375, 1381 (9th Cir.1990). The immigration judge "must have a legitimate articulable basis to question the petitioner's credibility, and must offer a specific, cogent reason for any stated disbelief," *Hartooni v. INS*, 21 F.3d 336, 342 (9th Cir.1994); *see also, e.g., Mosa v. Rogers*, 89 F.3d 601, 604 (9th Cir.1996) (citing *Turcios v. INS*, 821 F.2d 1396, 1399 (9th Cir.1987)); *Paredes–Urrestarazu v. INS*, 36 F.3d 801, 817 (9th Cir.1994), and any such reasons "must be substantial and bear a legitimate nexus to the finding." *Mosa*, 89 F.3d at 604; *Aguilera–Cota*, 914 F.2d at 1381. Moreover, "trivial errors" by an asylum applicant do not constitute "a valid ground upon which to base a finding that an asylum applicant is not credible." *Martinez–Sanchez v. INS*, 794 F.2d 1396, 1400 (9th Cir.1986) (quoting *Damaize–Job v. INS*, 787 F.2d 1332, 1337 (9th Cir.1986)). "Minor inconsistencies" that "reveal nothing about an asylum applicant's fear for his safety are not an adequate basis for an adverse credibility finding." *Vilorio–Lopez v. INS*, 852 F.2d 1137, 1142 (9th Cir. 1988). Similarly, the omission of details from an applicant's earlier testimony cannot serve as the basis for an adverse credibility finding: "If minor inconsistencies or misrepresentations of unimportant facts cannot constitute the basis for an adverse credibility finding, a fortiori minor omissions cannot." *Aguilera–Cota*, 914 F.2d at 1382.

■ In the present case, the mere statement that Osorio was "not credible" because of "inconsistencies" in his testimony does not begin to provide the "specific, cogent reason[s] for any stated disbelief" that this court requires. *Hartooni*, 21 F.3d at 342. Because neither the Board nor the immigration judge identified the specific inconsistencies on which they based their finding that Osorio was not credible, we cannot conclude that the adverse credibility finding was supported by substantial evidence. It is entirely possible

that the Board and the IJ relied on the kind of "minor omissions," "minor inconsistencies," and "trivial errors" that cannot support an adverse credibility finding. Neither the Board nor the IJ gave any indication of the nature or gravity of the "inconsistencies" that they purported to rely upon. Similarly, the IJ's finding that Villanueva's testimony was "credible," and the IJ's willingness to "presume" that she had "lawfully performed her duties," provide no support for an adverse credibility finding. The IJ did not identify any facts or inconsistencies that he deemed established by Villanueva's testimony or by his seemingly irrelevant belief that Villanueva had "lawfully performed her duties"; indeed, in light of the fact that Villanueva had no recollection of her interview with Osorio, it is unclear what probative value, if any, the IJ could have attached to her testimony. Finally, given the garbled nature of Osorio's first application—which the IJ identified as the source of the "inconsistencies" on which he purported to rely— any perceived "inconsistencies" may have been illusory: they may have been simply the product of a language barrier or of a misreading of a largely unintelligible document. This court has recognized that "[f]orms are frequently filled out by poor, illiterate people who do not speak English and are unable to retain counsel." *Aguilera–Cota v. INS*, 914 F.2d 1375, 1382 (9th Cir. 1990); *see also Hartooni v. INS*, 21 F.3d 336, 342 n. 1 (9th Cir.1994). The Board and the IJ could not have rejected Osorio's credibility without first evaluating what would seem in this case to be a plausible and therefore reasonable explanation for any inconsistencies they may have perceived. We find no indication that they did so here.

■ We must also reject the IJ's alternative holding that Osorio was not eligible for asylum "even if one were to assume that the respondent did experience persecution in Nicaragua or that at the time he left that country and for some time thereafter, he had a well-founded fear of persecution." The IJ

noted that, under the Board's decision in *Matter of Chen*, Interim Decision 3104 (B.I.A.1989), "past persecution alone might warrant a grant of asylum even if there was no reasonable likelihood of present persecution." However, the IJ stated that past persecution would suffice to qualify Osorio for asylum only if that persecution had been "so severe that return to the country of persecution would be inhumane" or if some "other humanitarian or compelling basis" existed.

■ Although the IJ correctly acknowledged the thrust of one part of the *Matter of Chen* decision—that a petitioner may be eligible for asylum on the basis of past persecution alone—the IJ failed to consider another critical part of that case. Under *Matter of Chen*, "a rebuttable presumption arises that an alien who has been persecuted by his country's government has reason to fear similar persecution in the future." Interim Decision 3104 at 4; *see Prasad v. INS*, 83 F.3d 315, 318 (9th Cir.1996). If that presumption is not rebutted, the petitioner is eligible for asylum.[1] Only if the presumption is rebutted must a petitioner demonstrate "severe" past persecution or other humanitarian reasons of the kind that the IJ insisted upon. *Matter of Chen*, Interim Decision 3104 at 4.

■ In this case, neither the IJ nor the Board recognized that Osorio was entitled to a presumption in his favor if his testimony established past persecution. Although the decision to grant asylum is a discretionary one, application of an erroneous legal standard constitutes an abuse of that discretion. *Yepes–Prado v. INS*, 10 F.3d 1363, 1366 (1993) (citing *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405, 110 S.Ct. 2447, 2460–61, 110 L.Ed.2d 359 (1990)); *Castro–O'Ryan v. U.S. Dept. of Immigration and Naturalization*, 847 F.2d 1307, 1314 (9th Cir. 1987). Moreover, although changed country conditions can under certain circumstances be used to rebut the presumption, the IJ took only cursory notice of the changes in Nicaragua and did not undertake the type of

---

1. That presumption was codified in the 1990 asylum regulations. *See* 8 C.F.R. § 208.13(b)(1)(i); *Surita v. INS*, 95 F.3d 814, 821 (9th Cir.1996); *Prasad*, 83 F.3d at 318. Those regulations do not apply to Osorio because he filed his asylum application before they became effective, *see* 8 C.F.R. § 208.1(a) (1994), but *Matter of Chen* does apply, as the IJ acknowledged, and was binding on both the IJ and the Board.

individualized analysis of Osorio's situation that we have found necessary to refute the presumption. *See Berroteran–Melendez v. INS,* 955 F.2d 1251, 1257 (9th Cir.1991). Failure to recognize the existence of a presumption in Osorio's favor—much less to rebut that presumption in an individualized manner—constitutes an abuse of discretion requiring a remand. *Surita v. INS,* 95 F.3d 814, 821 (9th Cir.1996).

## CONCLUSION

If, on remand, the Board or the IJ seeks to conclude once again that Osorio is not a credible witness, it must identify the specific inconsistencies on which it rests its adverse credibility determination, and it must address in a reasoned manner the explanations that Osorio offers for these perceived inconsistencies. In addition, if the Board or the IJ determines that Osorio has experienced past persecution, it must afford him the benefit of the presumption that he has a well-founded fear of future persecution. This presumption can be overcome only by an individualized analysis of Osorio's situation that demonstrates that changed conditions in Nicaragua have eliminated the basis for Osorio's individual fear of future persecution.

REMANDED.