**Gregory W. DILLON, Petitioner,**

v.

**DEPARTMENT OF JUSTICE,**
**Respondent.**

No. 02–3160.

United States Court of Appeals,
Federal Circuit.

DECIDED: Jan. 21, 2003.

Rehearing Denied April 10, 2003.

Before MICHEL, LOURIE, and DYK, Circuit Judges.

PER CURIAM.

Gregory W. Dillon petitions for review of the final decision of the Merit Systems Protection Board, denying his Individual Right of Action ("IRA") appeal brought under the Whistleblower Protection Act of 1989, Pub.L. No. 101–12, 103 Stat. 16 (codified in scattered sections of 5 U.S.C.) (the "WPA"). Because that decision was supported by substantial evidence, contained no procedural irregularities, and was not contrary to law, we *affirm.*

## BACKGROUND

Mr. Dillon is an attorney who was hired by the Department of Justice Immigration and Naturalization Service ("INS" or the "agency") as a GS–12 Asylum Officer on April 26, 1998, in the INS's San Francisco Asylum Office. According to Dillon's brief, he came to the INS with significant prior experience in asylum law, having co-edited a published manual on asylum law, won a reversal in an asylum case in the United States Court of Appeals for the Ninth Circuit, and practiced asylum law at "all administrative levels." Dillon also received extensive on-the-job training at the INS, including briefing on applicable statutory and regulatory provisions and asylum case law.

As an Asylum Officer, Dillon's duties included interviewing asylum applicants, reviewing the applicants' files, and preparing written assessments and decisions (collectively, "assessments") recommending either grant of political asylum or referral to an Immigration Judge for removal proceedings. *Dillon v. Dep't of Justice*, No. SF–1221–00–0052–W–3, slip op. at 2, 91 M.S.P.R. 128 (M.S.P.B. Jan. 25, 2002) (*"Initial Decision"*). In preparing his assessments, Dillon was to apply INS policy and INS-mandated interpretations of applicable statutes and case law to the particular circumstances of each case. *Id.* Each assessment was subject to review and modification by Dillon's supervisors, Supervisory Asylum Officers Stephen Johnston and Michael Biggs, who would determine whether the assessment was legally and factually sustainable and recommend any necessary changes to the assessment. *Id.* Although Dillon could discuss recommended changes with his supervisors if necessary, he was expected to incorporate those changes into the assessment and prepare a final decision. *Id.*

The record reflects that there were ample mechanisms in place for resolution of disagreements between Asylum officers and their supervisors. For example, in the event that Dillon and either Biggs or Johnston could not agree on changes to be made to an assessment, the former could have requested that the case be elevated to Deputy Director Emilia Bardini, or even to INS Headquarters, after review by the local asylum office's Quality Assurance Training Officer, Phillip Weintraub. *Id.* Mr. Weintraub's duties included informing Asylum Officers and their supervisors of the Headquarters' and the INS's General Counsel's interpretation of applicable policy, regulations, and case law, and reviewing certain cases to ensure that the policy and law were being applied properly. Additionally, assessments in particular categories of cases (*e.g.*, those involving applicants from Canada or Mexico, diplomats, or allegations of persecution) were forwarded to INS Headquarters for review and concurrence by Weintraub.

Weintraub testified before the Board that there was "a lot of dialogue and discussion" among the asylum staff regarding interpretations of law and policy. As the agency succinctly explains in its brief, based on Weintraub's testimony:

> [A]sylum law is complex and constantly evolving through frequent debate within the national and international legal community and through judicial interpretation in the courts. Asylum officers are trained that it is the role of INS headquarters to formulate agency positions taking into account the extensive body of often-conflicting judicial decisions, litigation strategy considerations, and the need for uniformity in decision-making. In the face of this complex area of law, asylum officers are trained that they are to follow the direction of the agency in applying asylum law to the facts of the cases they will be deciding.

Throughout Dillon's tenure at the INS, he apparently perceived there to be significant conflicts between INS policy and Ninth Circuit case law, as well as between his own and other INS officials' interpretations of both controlling asylum law and the proper application of that law to the facts of specific cases.[1] Rather than resolving these conflicts with his supervisors and making the necessary revisions to his work product, however, Dillon on several occasions demonstrated an unwillingness to follow the decisions of those supervisors. *Initial Decision* at 6–7. In some cases, Dillon resisted his supervisors even when they agreed with him in principle on the issue involved. *Id.* at 8.

On April 15, 1999, just prior to the expiration of Dillon's one-year probationary period, Ms. Bardini served Dillon and another Asylum Officer with notices of termination. *Id.* at 2, 17. Dillon thereafter filed a complaint at the Office of Special Counsel ("OSC"), alleging that he had been terminated in reprisal for engaging in protected whistleblowing activity. In particular, Dillon contended that he had made four disclosures that were protected under 5 U.S.C. § 2302(b)(8)(A). That statute provides that an agency may not take a personnel action with respect to any employee because of any disclosure of information by the employee that the employee reasonably believes evidences "a violation of law, rule, or regulation" or "gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and

specific danger to public health and safety." 5 U.S.C. § 2302(b)(8)(A) (2000).

The first of Dillon's allegedly protected disclosures was a letter that he sent to Biggs in October 1998, with a copy to Bardini, requesting to have an air quality inspection conducted in the asylum office. *Initial Decision* at 3. In the letter, which was also signed by five other employees, none of whom had any subsequent personnel action taken or threatened against them, Dillon stated his belief that there was a high level of interior pollutants in the workplace and that those pollutants were aggravating his asthma. Dillon also alleges that he brought that issue to the attention of Johnston, Supervisory Asylum Officer Cliff Gayde, and Sid Efferis, an Environmental Protection Agency (EPA) indoor air quality coordinator. *Id.* at 4.

The second purportedly protected disclosure was a short, informal memorandum that Dillon prepared at Bardini's request in June 1998 after he told her and Weintraub that he believed that the application of an internal agency policy, referred to as the "Maintaining Lawful Status Exception of the One–Year Rule," contradicted applicable case law. *Id.* at 4–5. In that memorandum, Dillon did not cite any specific case law or statute that he believed was being violated.[2] *Id.* at 5.

The third allegedly protected "disclosure" concerned Dillon's recommendation to grant asylum in a case involving a homosexual Mexican applicant. Dillon stated that he believed that he had written a

---

1. In particular, Dillon alleges that he "believed there was pattern [sic] of instructions to violate the law against Latinos."

2. Dillon asserts that he gave "citations to the volume and page of the official West Federal Reporters ... in two disclosures. On the third disclosure, the employee's [sic] described the law sufficiently that any supervisory attorney working in the field of law would be expected to recognize the problem."

Dillon does not say which of the two disclosures included such citations, and he does not point to any place in the record where evidence of such citations can be found, however. Of the four disclosures referred to above, only an undated document that appears to be the memorandum to Bardini is in the record before us, and it does not contain any case citations.

"particularly high quality" assessment in February 1999 to support his recommendation of asylum, based on his interpretation of relevant law. *Id.* at 5–6. Weintraub agreed with Dillon that granting asylum was legally and morally justified in this case, but he told Dillon that an "in the alternative" argument, alleging egregious conduct against the applicant, should also be added to the assessment to strengthen the recommendation of asylum. Stating that he believed the addition of that argument to contradict Biggs' previous instructions and to violate the relevant case law, Dillon brought Weintraub's request to Biggs' attention instead of making the requested change. *Id.* at 6.

The fourth disclosure that Dillon asserts was protected is a statement that he made regarding a disagreement with Biggs in March 1999 over the proper application of case law to the facts of a Guatemalan asylum-seeker's case. *Id.* The applicant had allegedly been raped, and Dillon "believed [the case] was controlled by the rule stated in" some prior case. Biggs disagreed and suggested that they seek the views of another Supervisory Asylum Officer, Rhonda Roberts, who had more specialized knowledge in the particular type of case at issue. *Id.* Rather than simply asking Ms. Roberts' advice, however, Dillon followed up by incorporating into the assessment in the asylum applicant's file what he termed "a rebuttal-style whistleblowing disclosure," in which he detailed his disagreement with Biggs. He then sent the assessment directly to Roberts. *Id.* at 6–7.

The OCS made a preliminary determination to close its investigation in October 1999, noting that Dillon's discussions and disagreements with his supervisors' advice regarding legal interpretations and proper adjudication of asylum application were clearly not disclosures of the type the

WPA was designed to encourage and protect. *Id.* at 7. Dillon then appealed to the Board under the IRA provisions of the WPA, 5 U.S.C. §§ 1214(a)(3) and 1221(a).

After conducting a lengthy hearing, the Administrative Judge ("AJ") denied Dillon's IRA, concluding: (1) that Dillon had failed to establish that the appealed action, *i.e.,* termination of his employment during his probationary period, was taken in reprisal for his alleged whistleblowing activities; and (2) that the agency had established that Dillon's employment would have been terminated even in the absence of those activities. *Initial Decision* at 11–16, 18. The AJ held that, although Dillon's disclosures regarding the air quality in his office were "of the type contemplated for protection by the WPA," there was no evidence tending to indicate that the letter or the subsequent contacts that Dillon allegedly made with the EPA coordinator and INS officials had any contributory effect on the agency's decision to terminate Dillon's employment more than six months later. *Id.* at 3–4, 9–11. Moreover, with regard to the remaining three "disclosures," the AJ concluded that none were "protected" within the meaning of 5 U.S.C § 2302(b)(8).

First, the AJ observed that the memorandum prepared at Bardini's request expressed only vague concerns about the impact of an agency policy, and, as mentioned above, did not cite any case law or statute that the policy violated. Moreover, the AJ found that Dillon's "repeated disagreements with Mr. Biggs and Mr. Weintraub about the One–Year Rule ... were simply disagreements over the application of a policy formulated by the agency which the appellant did not like." *Id.* at 5. "At most, this memorandum and the appellant's discussions with his supervisors reflect his disagreement with a policy formulated and approved by the agency's

highest management officials and legal authorities." *Id.* The AJ also found that, "[w]hile there appears to have been some confusion over the implementation of this new rule and the related policy, there is no testimony to suggest that any of the supervisors to whom [Dillon] directed his complaints about this policy were in any way concerned about the legality of the policy."

Secondly, the AJ found that, when Dillon reported to Biggs his disagreement with Weintraub, he again did not cite any specific statute, rule, or regulation that he believed the agency's policy violated. *Id.* at 6. Furthermore, the disagreements between Weintraub and Dillon were related only to the proper manner of formulating a recommended decision to render it acceptable to Headquarters, and did not concern the legality of the positions stated in that decision.[3] *Id.*

Third, the AJ found Dillon's disclosure to Roberts of his disagreement with Biggs to be only a reflection of his unwillingness to follow the guidance of his supervisors on a question of how to apply asylum case law to the facts of a specific case, and not a disclosure of the type the WPA was designed to encourage and protect. *Id.* at 6–7.

Dillon petitioned the Board for review of the initial decision. The Board denied his petition, *Dillon v. Department of Justice,* 91 M.S.P.R. 128 (Table) (Jan. 25, 2002), thus rendering the initial decision final. 5 C.F.R. § 1201.113(b) (2002); *Bonner v. Merit Sys. Prot. Bd.,* 781 F.2d 202, 205 n.* (Fed.Cir.1986). Dillon timely appealed to this court. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(9) (2000).

## DISCUSSION

"To prevail in a case of retaliation for whistleblowing under the WPA, an employee must show by a preponderance of the evidence that a protected disclosure was made and that it was a contributing factor in the personnel action." *Willis v. Dep't of Agric.,* 141 F.3d 1139, 1143 (Fed. Cir.1998); *see also* 5 U.S.C. § 1221(e)(1); 5 C.F.R. § 1209.7; *Ellison v. Merit Sys. Prot. Bd.,* 7 F.3d 1031, 1034 (Fed.Cir.1993). If the employee fails to demonstrate that the aggrieved personnel action was the result of a prohibited personnel action as defined by § 2302(a)(2), he is not entitled to corrective relief under the WPA. *Willis,* 141 F.3d at 1143.

Congress has expressly limited the scope of our review in an appeal from the Board. Specifically, we must affirm the Board's decision unless we find it to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; obtained without procedures required by law, rule, or regulation having been followed; or unsupported by substantial evidence. 5 U.S.C. § 7703(c) (2000); *Ellison,* 7 F.3d at 1034. Contrary to Dillon's assertion, we do not "look[ ] for substantial evidence that the employee did or did not establish his case by predominate [sic] evidence," or look for "substantial evidence that shows the government established its case by clear and convincing evidence." The question before us is not how the court would rule upon a *de novo* appraisal of the facts of the case, as Dillon would

---

**3.** In his appellate brief, Dillon argues that he "told Biggs that the changes Weintraub wanted would violate the Ninth Circuit case law of Osorio. *Osorio v. INS,* 99 F.3d 928, 932–22 [sic] (9th Cir.1996). The employee [Dillon] believed that *Osorio* required a presumption of law in favor of a grant operable on the particular facts." Dillon has not explained, however, how *adding* an alternative basis for granting asylum to the assessment as a fallback position (*i.e.,* in case the INS Headquarters found *Osorio* not controlling) could have violated the holding of *Osorio.*

suggest, but rather whether *the Board's decision* is supported by substantial evidence in the record as a whole. *Hayes v. Dep't of the Navy*, 727 F.2d 1535, 1537 (Fed.Cir.1984).

Dillon first challenges the AJ's conclusion that he is not entitled to corrective relief under the WPA, on the basis of the AJ's "seemingly inconsistent language to state that the same disclosures had been a contributing factor in his removal, and was [sic] not a contributing factor in the removal." Dillon argues, "[t]he initial decision stated in underlined terms that *the appellant's disclosure regarding the air quality in his office was a contributing factor in the agency's personnel action.* (emphasis in original.).""

Dillon's argument is without merit. It is abundantly clear from the context of the underlined phrase quoted by Dillon that that phrase was nothing more than a subheading that either contained a typographical error (*i.e.*, it was missing the word "not" between "was" and "a contributing factor") or else simply restated Dillon's own argument for the purpose of refutation. In either case, the text following the subheading clearly and unambiguously sets forth not only the AJ's conclusion that Dillon's disclosure was *not* a contributing factor in his removal, a holding entirely consistent with the statements at page 4 of the initial decision, but also the AJ's factual basis for that conclusion. *Initial Decision* at 9–11. That basis included, *inter alia,* findings that: (1) the other employees who signed the letter regarding air quality did not have any disciplinary actions proposed against them; and (2) Bardini herself was also concerned for her health and the health of her daughter, who was in a day care center in the same building. *Id.*

Furthermore, at pages 11–16 of the initial decision, the AJ set forth numerous findings that support the conclusion that Dillon's employment would have been terminated even in the absence of the disclosures on which he based his claim of reprisal. The AJ found, for example, that there "were several distinct incidents as well as a pattern of behavior evidenced by the appellant that led Ms. Bardini to conclude that the appellant should not be retained." *Id.* at 12. Among those incidents was one in which Johnston became frustrated when Dillon resisted making revisions to a "conclusory and confusing" assessment he had prepared in a case concerning a Congolese asylum applicant. Johnston sent the case to Weintraub, who also found the assessment unclear and became "frustrated, to say the least," by Dillon's "unwillingness to listen." *Id.* In the matter of the homosexual Mexican asylum applicant referred to above, the AJ found evidence of similar intransigence. In that case, even though Dillon and his supervisors had agreed that the applicant should be granted asylum, Dillon nonetheless resisted making the changes to his assessment that Weintraub told him were necessary for the application to pass muster in the INS Headquarters, which, Weintraub explained, had "a different view" of such cases than did the San Francisco Asylum Office. *Id.* at 12–13.

Finally, the AJ related Bardini's testimony that the primary reason for her decision not to retain Dillon was his persistently uncooperative and inflexible way of dealing with instructions from Weintraub, Biggs, and Johnston. *Id.* at 14–15. Bardini's statements along those lines were corroborated by Biggs' testimony that it "took an inordinate amount of time" to get Dillon to comply with directions; Johnston's testimony that Dillon was "quite difficult" and "very reluctant" to make necessary changes; and Weintraub's testimony that Dillon was "stubborn" and "not willing to listen to direction." *Id.* at 15.

Bardini also testified that members of the asylum staff had regularly gone to her to complain about Dillon's disruptive behavior and their frustrations in dealing with him, and that she had conferred with her own supervisor prior to making the decision to terminate Dillon. *Id.* at 16.

Dillon contends that the AJ committed legal error, abused his discretion, and/or "authored an opinion without procedures required by law," because he "did not make creditability [sic] determination and the employee has shown in his opening brief that there were serious and material difference [sic] in testimony among various witness [sic], and between the deciding official and extrinsic documentary evidence." Dillon is mistaken. First, as the agency's brief correctly points out, this court's precedent is clear that credibility determinations are the province of the official who heard the witnesses' testimony and saw their demeanor, *Griessenauer v. Dep't of Energy,* 754 F.2d 361, 364 (Fed. Cir.1985), and "are virtually unreviewable" upon appeal, *Hambsch v. Dep't of the Treasury,* 796 F.2d 430, 436 (Fed.Cir. 1986). Secondly, whether the AJ explicitly stated so or not, his reliance on the testimony of Dillon's supervisors Biggs, Johnston, Weintraub, and Bardini evinces his having made favorable credibility determinations with respect to them.

In view of the AJ's findings, we conclude that substantial evidence supports the AJ's holding that "the agency has produced ample evidence in support of its decision not to retain the appellant past his probationary period." *Id.*

Dillon also alleges that "the AJ was arbitrary and capricious, and issued a decision that obtained [sic] without procedures required by law when he failed to cover the two personnel actions the employee added in his amended whistleblower action." The two personnel actions that Dillon refers to are: (1) the agency's failure to provide him with two weeks' notice of his removal as provided for in "the union contract"; and (2) the agency's failure to provide "a performance evaluation at the outstanding or excellent level." We conclude that the AJ's error, if there was one, was harmless. First, we find no evidence in the record before us of any union contract requiring two weeks' notice of termination. Moreover, the agency argues in its brief that there was, in fact, no such requirement, and Dillon has not produced any evidence to the contrary.[4] Even if the two-week notice term *had* been required, however, *and* the AJ also failed to consider it, his error would still be harmless. As we concluded above, substantial evidence supports the AJ's conclusion that the only "protected" disclosure that Dillon made— *i.e.,* the disclosure relating to the air quality—was not a contributing factor in his removal. The same evidence would have supported *a fortiori* the conclusion that that disclosure was not a contributing factor in the decision to remove Dillon immediately rather than to give him two weeks' notice. Indeed, the argument that the agency would have deprived Dillon of two weeks' notice as a result of a disclosure of poor air quality made more than six months earlier is frivolous. Secondly, even if the AJ did not consider Dillon's "poor" evaluation to be a personnel action, we have already held that substantial evidence supports the AJ's conclusion that Dillon's employment would have been ter-

---

4. In his reply brief, Dillon attempts to rebut the argument that "the agency brief dissumlatingly [sic] states," by alleging that "[u]nder the relevant collective bargaining agreement the agency agreed to provide probationary employees, like the employee, two weeks notice before termination." Unfortunately, Dillon did not include that collective bargaining agreement in the record.

minated even in the absence of his allegedly protected disclosures as a result of his supervisors' complaints regarding his resistance to following their guidance and instructions. Substantial evidence would have likewise supported a holding that Dillon's performance would not have been evaluated as "outstanding or excellent" even in the absence of those disclosures.

We have considered Dillon's remaining arguments and find them unconvincing.

## CONCLUSION

Substantial evidence supports the Board's decision. Accordingly, we affirm.

DYK, Circuit Judge, concurring in part and dissenting in part.

I agree with the majority insofar as it sustains the administrative judge's finding that Gregory Dillon's ("petitioner's") air quality complaints were not a contributing factor in his removal, and that the two weeks' notice and poor evaluation arguments lack merit. I also agree that there is substantial evidence that would support a finding that the petitioner would have been dismissed even absent the statements he alleged were protected.

However, I conclude that the petitioner's disclosures about the "One Year Rule" and the Guatemalan rape case likely constituted protected activity under the Whistleblowers Protection Act of 1989, Pub.L. No, 101–12, 103 Stat. 16 (codified in scattered sections of 5 U.S.C.), and should not have been relied on by the administrative judge in finding that the petitioner was "insubordinate" and would have been dismissed regardless of the alleged disclosures. I would therefore remand for further findings by the administrative judge to ensure that protected activity played no role in the administrative judge's finding that the

petitioner would have been dismissed regardless of the disclosures.