**Alejo Rasquero GANUT, Petitioner,**

v.

**John ASHCROFT, Attorney General, Respondent.**

No. 02–70773.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 3, 2003.

Decided Dec. 19, 2003.

David P. McCauley, Esq., Honolulu, HI, for Petitioner.

Regional Counsel, Western Region, Immigration & Naturalization Service, Laguna Niguel, CA, HI–District Counsel, Office of the District Counsel, Department of Homeland Security, Honolulu, HI, Ronald E. LeFevre, Chief Legal Officer, Office of the District Counsel, Department of Homeland Security, San Francisco, CA, Norah Ascoli Schwarz, Esq., David M. McConnell, DOJ—U.S. Department of Justice, Civil Div./Office of Immigration Lit., Washington, DC, for Respondent.

Before BROWNING, REINHARDT, and THOMAS, Circuit Judges.

## MEMORANDUM *

Petitioner Alejo Ganut petitions for review of a decision of the Board of Immigration Appeals ("BIA") dismissing his appeal from a decision of an immigration judge denying his application for asylum and ordering him excluded and deported from the United States. We grant the petition for review and remand this case to the BIA for further proceedings.

### I

Ganut is a Philippines citizen who served as personal security guard and valet to former Philippine President Ferdinand Marcos from 1972 until Marcos' death in September 1989. As Marcos' personal security valet, Ganut was a highly visible member of Marcos' inner circle and, according to one chronicler of the Marcos regime, "was one of the three closest and familiar faces around Marcos wherever he went."

After the 1986 Philippine presidential election, the Marcos regime came under intense domestic pressure. The election was widely viewed as fraudulent. Marcos'

* This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36–3.

political opponent in the election, Corazon Aquino, held a large rally calling for the Philippine citizens to unseat the government through civil disobedience. Violence erupted. Marcos' Defense Minister and the Deputy Chief of Staff of the Armed Forces decided to join the attempt to overthrow President Marcos.

The United States initiated diplomatic contacts with Marcos. Ganut alleges that on February 25, 1986, Senator Paul Laxalt telephoned Marcos on behalf of President Reagan and offered Marcos and his family asylum in the United States. That day, rebel forces attacked the Presidential Malacañang Palace in Manila. Three missiles were launched from a rebel helicopter. One struck the room in which President Marcos usually rested; the other two struck the palace close to the room where Ganut and Marcos were conferring. Two guards died from wounds suffered in the missile attack. The palace was peppered by machine gun fire. Ganut thought the attackers were likely to kill the Marcos's and their staff. When a mob broke into the palace grounds the next day, the United States evacuated Marcos and his staff, including Ganut, to Clark Air Force base in Manila. According to Ganut, they were told that they would be subsequently transported to Marcos' home province of Ilocos Norte.

After arriving at Clark Air Force base, the Marcos party was awakened during the night and informed that Clark Air Force base had been surrounded by forces of the New People's Army, and that the United States armed forces could no longer guarantee the safety of the Marcos party. The evacuees were then transported to Guam aboard a United States military aircraft. The members of the Marcos party, including Ganut, were paroled into the United States as a matter of public interest during the military plane's layover

in Agana, Guam. The Marcos party was then flown to Hickam Air Force base in Hawaii.

Ferdinand Marcos remained in Hawaii until his death in 1989, and Ganut continued to work for him. Shortly after arriving in Hawaii, President Marcos wrote the following letter to the district director of the INS:

I am writing you in behalf of the following members of my party who desire to apply for Asylum Status:

1. Colonel Teodoro D. Alonzo

2. Major Orlando R. Villa

3. Agent Alejo R. Ganut, Jr.

4. Agent Ferdinand A. Bolibel

These Officers and Agents have been so identified as my Closed–In Securities with my administration that they fear for their lives. If they return to the Philippines, I am sure that they and their families will be subjected to all forms of harassment and persecution under the present Aquino government.

They have elected therefore to apply for asylum in the United States of America.

I wish to take this ocassion [sic] to thank you and your Immigration Officers for the help you have been extending to me and my party.

On April 16, 1986, Ganut wrote to the Hawaii District Director of the Immigration and Naturalization Service ("INS"), asking "that the immediate members of my family be allowed the privilege of joining me here in the U.S.A. and be extended the same status (parole and employment authorized) as I have." This request was granted, and Ganut's family joined him in Hawaii in 1986. Ganut's parole status was extended numerous times between 1986 and 1992. Forms extending Ganut's parole status, and that of his family members, were marked with either a specific

duration or indicated that parole was "indefinite."

In early 1992, Ganut was informed that "in light of the death of President Marcos and the recent voluntary return of Mrs. Marcos to the Philippines, it has been determined that there is no longer any need for further exercise of the Attorney General's parole authority. . . ." Ganut was given until June 30, 1992 to depart.

Ganut's subsequent application for adjustment of status to permanent resident was denied on September 15, 1992, and he was re-paroled to file an asylum petition. Ganut's asylum application was denied on August 5, 1993. On September 8, 1995, Ganut wrote to the INS asking for further deferred action (i.e. a discretionary decision by the INS not to institute removal proceedings). The INS denied this request on July 9, 1996.

The INS instituted exclusion proceedings three months later. Ganut was charged with being excludable pursuant to Immigration and Naturalization Act §§ 212(a)(5)(A)(i) & (7)(A)(i)(I), 8 U.S.C. §§ 1182(a)(5)(A)(i), (7)(A)(i)(I), 8 U.S.C. §§ 1182(a)(5)(A)(I) & 7(A)(i)(I). The charge stated:

> you intend to work and reside permanently in the United States, and you are not in possession of a labor certification or a valid, unexpired immigrant visa or other valid entry documents in lieu of a valid, unexpired immigrant visa.

After a hearing on the merits in which Ganut conceded excludability, the IJ found Ganut excludable as charged, denied relief on Ganut's asylum and withholding of deportation claims, and ordered Ganut deported. In denying Ganut's application for asylum, the IJ held that Ganut had "failed to present any credible evidence that any members of the Marcos entourage have been punished in the Philippines because of their connections with the Marcos re-

gime." The IJ also rejected Ganut's claim that a civil action filed against him in the Philippines to sequester Ganut's many bank accounts and personal property was evidence of a well-founded fear of persecution.

Ganut filed a timely appeal with BIA, challenging, *inter alia*, the legitimacy of being placed in exclusion rather than deportation proceedings. He also reiterated his asylum claim, asserted that the Government was estopped from denying that Ganut had been granted asylum on entry to the United States, and requested that the BIA terminate the pending proceedings and direct the INS to reinitiate proceedings under the removal procedures of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996. The BIA rejected these claims and upheld the IJ's order of deportation. The BIA dismissed Ganut's claim that he was improperly placed in exclusion proceedings, stating that "[a]n alien paroled into the United States pending exclusion proceedings, even if for a relatively long period of time, does not gain the additional protections prescribed for deportation hearings." The BIA found that the IJ's determination that Ganut did not have a well-founded fear of persecution was supported by substantial evidence. The BIA also rejected Ganut's estoppel claim as contrary to administrative authority. Ganut filed the present timely petition for review.

## II

█ The BIA correctly rejected Ganut's claim that he was improperly placed in exclusion proceedings instead of deportation proceedings. Aliens who are paroled into the United States are considered never to have "entered" the country and are subject to exclusion proceedings, rather than deportation proceedings, if and when

the Attorney General determines that the purposes of the parole have been served. *See* 8 U.S.C. § 1182(d)(5)(A); *Leng May Ma v. Barber*, 357 U.S. 185, 187, 78 S.Ct. 1072, 2 L.Ed.2d 1246 (1958); *Barney v. Rogers*, 83 F.3d 318, 321 (9th Cir.1996).

Ganut does not dispute that he and his family were paroled into the United States in 1986. Indeed, he evinced his knowledge of this in his correspondence with the INS. Therefore, the BIA correctly concluded that Ganut was properly placed in exclusion proceedings.

Ganut also argues that because he was brought to the United States "at the behest of the President of the United States," he should be placed in deportation proceedings, rather than exclusion proceedings. However, there is no legal authority for this proposition, and the record does not contain evidence of any direct promises by the President to Ganut. Indeed, the record is devoid of any representation that Ganut would be subject to deportation rather than exclusion proceedings. Furthermore, the grant of parole status is not inconsistent with the Government's action in giving the Marcos party a temporary safe haven in the United States.

### III

The BIA correctly held that Ganut had failed to establish his equitable estoppel claim. Estoppel may be applied against the INS where it engages in some "affirmative misconduct" beyond mere negligence. *See Socop–Gonzalez v. INS*, 272 F.3d 1176, 1184 (9th Cir.2001) (en banc) (equitable estoppel applies only if INS engages in "affirmative misconduct" which is defined "to mean a 'deliberate lie' or 'a pattern of false promises'") (quoting *Mukherjee v. INS*, 793 F.2d 1006, 1008 (9th Cir.1986)). Delay alone is insufficient to constitute INS affirmative misconduct.

*INS v. Miranda*, 459 U.S. 14, 18–19, 103 S.Ct. 281, 74 L.Ed.2d 12 (1982).

■ Ganut asserts several bases for his claim of equitable estoppel. First, he claims he was wrongfully removed from the Philippines without his consent. However, in the immigration context, the remedy for this allegedly wrongful act would be return to the Philippines. Put another way, if his theory were proven, the United States would be estopped from denying that he had a right to return. Ganut concedes there was never any barrier to his return, and the relief he seeks is to be allowed to stay in the United States. Thus, this claim of equitable estoppel fails.

■ Ganut also claims that the government misled him into believing that he could remain in the United States permanently. However, his request to the INS that his family be allowed to join him in the United States on parole status evidences his knowledge of his status. Further, we have held that "[n]either the failure to inform an individual of his or her legal rights nor the negligent provision of misinformation constitute affirmative misconduct." *Sulit v. Schiltgen*, 213 F.3d 449, 454 (9th Cir.2000). Thus, even if Ganut's factual assertions were true, no claim of equitable estoppel would lie.

### IV

Ganut seeks asylum. He claims past persecution and seeks asylum on the basis of a well-founded fear of future persecution if he returns to the Philippines. To be eligible for a grant of asylum, Ganut must show that he is a refugee. 8 U.S.C. § 1158(b)(1). A refugee is one who is "unable or unwilling to avail himself or herself of the protection of [his or her native] country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, mem-

bership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A).

To establish a well-founded fear of persecution, the applicant must establish both a genuine subjective fear of persecution and an objective basis for that fear. *Singh v. INS*, 134 F.3d 962, 966 (9th Cir.1998). The objective prong requires a showing of "some direct, credible evidence supporting the claim." *Sarvia–Quintanilla v. INS*, 767 F.2d 1387, 1394 (9th Cir.1985). "An alien who establishes past persecution is presumed to have a well-founded fear of future persecution." (*Gaya Prasad v. INS*, 101 F.3d 614, 617 (9th Cir.1996))

The IJ and the BIA rejected Ganut's claim of past persecution without analysis. Rather, the BIA concluded that Ganut had no well-founded fear of future persecution because country conditions had changed and Imelda Marcos had returned to the Philippines without incident. Ganut disputes these assertions.

The difficulty with the BIA decision is that it failed to account for past persecution. In order to show past persecution, Ganut must demonstrate (1) that his encounters with the anti-government forces rise to the level of persecution; 2) that the persecution was on account of one or more of the five protected grounds; and 3) that the persecution was committed either by the government or by forces that the government was unable or unwilling to control. *Chand v. INS*, 222 F.3d 1066, 1073 (9th Cir.2000).

We have defined persecution as "the infliction of suffering or harm upon those who differ (in race, religion or political opinion) in a way regarded as offensive." *Fisher v. INS*, 79 F.3d 955, 961 (9th Cir. 1996) (en banc) (internal quotation marks omitted); *see also Kovac v. INS*, 407 F.2d 102, 107 (9th Cir.1969). Threats and attacks can constitute persecution even where an applicant has not been beaten or physically harmed. *See, e.g., Artiga Turcios v. INS*, 829 F.2d 720, 723–24 (9th Cir. 1987) (holding that petitioner had established persecution even though he had not been physically harmed and received only an indirect threat relayed by a neighbor).

■ Here, Ganut and his party were attacked by forces that the government was unable to control. Indeed, not only was the Philippine government unable to control these forces, the United States also apparently was unable to control them, because the Marcos entourage was informed that the United States could not guarantee their safety in the Philippines. Under our case law, the attacks unquestionably rose to the level of persecution. Indeed, there could hardly be a more compelling case to establish persecution than a machine gun attack, a multiple missile attack that killed members of the entourage, and a mob storming the gates. All of this required the Marcos party to escape secretly by boat to an awaiting United States helicopter. Even at Clark Air Force base in Manila, the United States would not guarantee the safety of the party and evacuated them in the middle of the night to Guam and ultimately Hawaii.

In addition to showing past persecution, Ganut is obligated to demonstrate that the persecution was "on account of" his political opinion. It is quite clear that the attacks on the palace were motivated by politics. It was the object of the attackers to overthrow the government. The fact that Ganut probably had not expressed his political views to the insurgents is of no consequence. Indeed, "whether the political opinion is actually held or implied makes little difference where the alien's life is equally at risk." *Desir v. Ilchert*, 840 F.2d 723, 729 (9th Cir.1988).

**44**

The fact that the political positions of Ferdinand Marcos were imputed to Ganut is quite clear from the record. As we have noted, he was regarded as one of the handful of individuals closest to Marcos. Marcos said in his letter to the INS that he was seeking asylum for Ganut on the basis that he was "so identified ... with my administration" that Ganut feared for his life if he returned to the Philippines. Ganut also presented evidence that his family had been harassed until he was able to remove them from the Philippines; that he had been named in various legal actions as an intimate member of the Marcos regime; and that he had been listed as a Marcos sympathizer in public notices in the Philippines. In short, the record establishing imputed opinion is quite strong.

Substantial evidence does not support the BIA's conclusion that Ganut had not suffered past persecution. Indeed, neither the BIA nor the IJ offered any analysis on this issue at all. As indicated by the foregoing analysis, substantial evidence compels a finding of past persecution on the basis of imputed political opinion in this case.

### V

Ganut contends that, regardless of any past persecution, he has established a well-founded fear of future persecution. The INS disputes this, pointing to changed country conditions and the fact that Imelda Marcos had successfully returned to the Philippines. However, it is not appropriate for us to resolve this question.

█ A showing of past persecution creates a rebuttable presumption of a well-founded fear of future persecution. When the BIA errs in its conclusion that an applicant has suffered past persecution, we must remand so that the BIA can afford the presumption and then "undertake the type of individualized assessment of [the applicant's] situation that we have found necessary to refute the presumption." *Osorio v. INS,* 99 F.3d 928, 932–33 (9th Cir.1996). Because the BIA did not consider Ganut's application in light of the presumption created by past persecution, we must remand to the BIA so that it may undertake that inquiry. *See Ventura v. INS,* 317 F.3d 1003, 1005 (9th Cir.2003); *Shoafera v. INS,* 228 F.3d 1070, 1076 (9th Cir.2000).

**PETITION FOR REVIEW GRANTED; REMANDED FOR FURTHER PROCEEDINGS.**